**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| VISION WORKS IP CORP.,<br>Plaintiff,<br><br>v.<br><br>TESLA, INC.,<br>Defendant. | Civil Action No. 2:25-cv-00999-JRG<br><br>**JURY TRIAL DEMANDED** |

# FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Vision Works IP Corp. (hereinafter, "Plaintiff" or "Vision Works") files this First Amended Complaint for patent infringement against Defendant Tesla, Inc. ("Tesla" or "Defendant") alleging, based on its own knowledge as to itself and its own actions, and based on information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This is a patent infringement action to stop Defendant's infringement of the following United States Patents (collectively, the "Asserted Patents") issued by the United States Patent and Trademark Office ("USPTO"):

| | U.S. Patent No. | Reference |
|---|---|---|
| 1. | 8,315,769 | https://ppubs.uspto.gov/pubwebapp/authorize.html?redirect=print/pdfRedirectDownload/8315769<br>https://patents.google.com/patent/US8315769B2/en?oq=8315769 |
| 2. | 8,682,558 | https://ppubs.uspto.gov/pubwebapp/authorize.html?redirect=print/pdfRedirectDownload/8682558<br>https://patents.google.com/patent/US8682558B2/en?oq=8682558 |
| 3. | 9,830,821 | https://ppubs.uspto.gov/pubwebapp/authorize.html?redirect=print/pdfRedirectDownload/9830821<br>https://patents.google.com/patent/US9830821B2/en?oq=9830821 |

| | U.S. Patent No. | Reference |
|---|---|---|
| 4. | 10,391,989 | https://ppubs.uspto.gov/pubwebapp/authorize.html?redirect=print/pdfRedirectDownload/10391989<br>https://patents.google.com/patent/US10391989B2/en?oq=10391989 |
| 5. | 10,410,520 | https://ppubs.uspto.gov/pubwebapp/authorize.html?redirect=print/pdfRedirectDownload/10410520<br>https://patents.google.com/patent/US10410520B2/en?oq=10410520 |

2. Plaintiff seeks monetary damages and injunctive relief. In support, Vision Works attaches as **Exhibit 1** the Declaration of Dr. Michael Nranian (hereinafter, "Nranian Decl.").

## PARTIES

3. Vision Works is a corporation organized and existing under the laws of the State of Washington and maintains its principal place of business at 202 Mineral Road N., Mineral, Washington, 98355 (Lewis County).

4. Based upon public information, Tesla is a corporation organized under the laws of the State of Texas.

5. Based upon public information, Tesla has its principal place of business located at 1 Tesla Road, Austin, Texas, 78725.[1]

6. Based upon public information, Tesla may be served through its registered agent: C T Corporation System, located at 1999 Bryan Street, Suite 900, Dallas, Texas, 75201.

## JURISDICTION AND VENUE

7. Plaintiff repeats and re-alleges the allegations in the Paragraphs above as though fully set forth in their entirety.

8. This action arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, including 35 U.S.C. §§ 271, 281, 283, 284, and 285. This Court has subject matter jurisdiction

[1] *See* https://www.tesla.com/contact (last visited September 19, 2025)

over this case for patent infringement under 28 U.S.C. §§ 1331 and 1338(a).

9. Tesla is subject to this Court's specific and general personal jurisdiction under due process due to at least its substantial business in this Judicial District, in the State of Texas, and in the United States, including: (i) at least a portion of the infringements alleged herein; and (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct, or deriving substantial revenue from goods and services provided to individuals in this state, in this District, and in the United States.

10. Specifically, Tesla intends to do and does business in, has committed acts of infringement in, and continues to commit acts of infringement in this District, in the State of Texas, and in the United States, directly, through intermediaries, by contributing to and through the inducement of third parties, and offers and sends its products and services, including those accused of infringement here, to customers and potential customers located in this state, including in this District, and in the United States.

11. More specifically, Tesla directly and/or through its intermediaries, ships, distributes, makes, uses, imports, offers for sale, sells, and/or advertises its products and services in the United States, the State of Texas, and in this District. Defendant has authorized sellers and sales representatives that offer and sell products identified in this Complaint throughout the State of Texas, including in this Judicial District, and to consumers throughout this Judicial District, such as in Tesla authorized dealerships in this District and State. In particular, Tesla maintains the following sales locations in this District: 5800 Democracy Drive, Plano, Texas 75024; 300 Lexington Drive, Plano, Texas 75075; 7500 Windrose Avenue Space B185, Plano, Texas 75024; 1805 Justin Road, Flower Mound, Texas 75028; 6155 Eastex Freeway, Beaumont, Texas 77706;

and 3408 S SW Loop 323, Tyler, Texas 75701.[2]

12. On information and belief, Tesla has significant ties to, and presence in, the State of Texas and this District, making venue in this Judicial District both proper and convenient for this action.

13. Therefore, venue is proper in this District pursuant to 28 U.S.C. §1400(b).

**BACKGROUND OF THE ASSERTED PATENTS**

14. U.S. Patent No. 8,315,769 was filed on November 22, 2011, and it claims both a method and apparatus for a communication system for a vehicle that includes a vehicle speed sensor, an acceleration monitoring system, a braking system engagement detector, an alerting device, and a control device. ’769 patent, Abstract. The ’769 patent is a continuation of application No. 13/182,258, which was filed on July 13, 2011; which is a continuation of application No. 12/434,577, which was filed on May 1, 2009, and issued as U.S. Patent No. 8,000,871; which is a continuation of application No. 11/585,401, which was filed on October 23, 2006, and issued as U.S. Patent No. 7,529,609; which is a continuation-in-part of application No. 11/243,364, which was filed on October 3, 2005, and issued as U.S. Patent No. 7,239,953; and which ultimately claims priority to provisional application No. 60/616,400, which was filed on October 5, 2004. In general, the ’769 patent is directed to methods and devices for detecting absolute levels of longitudinal, lateral and vertical acceleration within moving vehicles, and to a variety of systems and methods for generating responses to changes in these absolute levels. *Id.* at 1:34-38.

15. U.S. Patent No. 8,682,558 was filed on October 11, 2012, and it claims systems, methods, and devices for a communication system for a vehicle including a vehicle speed sensor

---

[2] *See* https://www.tesla.com/findus/list/stores/United+States (last visited September 5, 2025)

configured to emit a periodic function with a parameter correlated to the speed of the vehicle, an acceleration monitoring system, a braking system engagement detector to detect a braking status of the vehicle, an alerting device capable of signaling other drivers of a deceleration condition of the vehicle, and a control device. ’558 patent, Abstract. The ’558 patent is a continuation of the ’769 patent, and ultimately claims priority to provisional application No. 60/616,400, which was filed on October 5, 2004. In general, the ’558 patent “relates generally to methods and devices for detecting absolute levels of longitudinal, lateral and vertical acceleration within moving vehicles, and to a variety of system and methods for generating responses to changes in these absolute levels.” *Id.* at 1:40-44.

16. U.S. Patent No. 9,830,821 was filed on December 29, 2014, and it claims systems and methods for a communication system comprising a pointable range finder to calculate a distance between a vehicle and an object, a recorder for recording a status of the vehicle, and a control device. ’820 patent, Abstract. The ’820 patent is a division of application No. 14/911,527, which was filed on August 27, 2013, and issued as U.S. Patent No. 8,954,251; which is a continuation-in-part of application No. 12/827,463, which was filed on June 30, 2010, and issued as U.S. Patent No. 8,903,617; which is a continuation-in-part of application No. 12/464,601, which was filed on May 12, 2009, and issued as U.S. Patent No. 8,437,935; which is a continuation-in-part of application No. 12/434,577, which was filed on May 1, 2009, and issued as U.S. Patent No. 8,000,071; which is a continuation of application No. 11/585,401, which was filed on October 23, 2006, and issued as U.S. Patent No. 7,529,609; which is a continuation-in-part of application No. 11/243,364, which was filed on October 3, 2005, and issued as U.S. Patent No. 7,239,953; and which ultimately claims priority to provisional application No. 60/616,400, which was filed on October 5, 2004. The ’821 patent relates generally to methods and devices for detecting absolute

levels of longitudinal, lateral, and vertical acceleration within moving vehicles, and to a variety of systems and methods for generating responses to changes in these absolute levels. *Id.* at 1:43-47.

17. U.S. Patent No. 10,410,520 was filed on October 24, 2017, and it claims systems and methods for a communication system comprising a pointable range finder to calculate a distance between the vehicle and an object, a recorder for recording a status of the vehicle and a control device. ’520 patent, Abstract. The ’520 patent is a continuation of the ’821 patent, and ultimately claims priority to provisional application No. 60/616,400, which was filed on October 5, 2004. In general, the ’520 patent “relates generally to methods and devices for detecting absolute levels of longitudinal, lateral and vertical acceleration within moving vehicles, and to a variety of systems and methods for generating responses to changes in these absolute levels.” *Id.* at 1:38-42.

18. U.S. Patent No. 10,391,989 was filed on October 23, 2017, and it claims systems and methods for a communication system for a vehicle comprising a mechanism for sensing a motion status of a vehicle, a control device, a plurality of data acquisition sensors, and one or more alerting device activation circuits. ’989 patent, Abstract. The ’989 patent is a division of application No. 14,340,443, which was filed on July 24, 2014; which is a continuation-in-part of application No. 14/149,695, which was filed on January 7, 2014, and issued as U.S. Patent No. 9,327,726; which is a continuation-in-part of application No. 14/011,527, which was filed on August 27, 2013, and issued as U.S. Patent No. 8,954,251; which is a continuation-in-part of application No. 12/464,601, which was filed on May 12, 2009, and issued as U.S. Patent No. 8,437,935; which is a continuation-in-part of application No. 12/434,577, which was filed on May 1, 2009, and issued as U.S. Patent No. 8,000,571; which is a continuation of application No. 11/585,401, which was filed on October 23, 2006, and issued as U.S. Patent No. 7,529,609; which is a continuation-in-part of application No. 11/243,364, which was filed on October 3, 2005, and issued as U.S. Patent

No. 7,239,953; and which ultimately claims priority to provisional application No. 60/616,400, which was filed on October 5, 2004. The ’989 patent relates generally to methods and devices for detecting absolute levels of longitudinal, lateral, and vertical acceleration within moving vehicles, and to a variety of systems and methods for generating responses to changes in these absolute levels. *Id.* at 1:56-60.

**THE TECHNICAL PROBLEMS IN VEHICLE CONTROL AND SAFETY SYSTEMS IN OCTOBER 2004.**

19. The Vehicle Control and Safety Patents discuss certain prior art systems and the state of vehicle monitoring and control systems at great length. As the specification notes, in October of 2004, there was a “wide variety of applications within modern motor vehicles [for the use of, for instance, accelerometers].” ’769 patent, at 1:42-43. Accelerometers are devices that are extremely sensitive to any gravitational force to which they are not perpendicular, leading them to be known as, for instance, “tilt sensors” in the gaming and robotics industries. ’769 patent, at 1:67-2:3. Nranian Decl., at ¶ 28.

20. The specification of the Vehicle Control and Safety Patents goes on to explain that “[t]he most common of these are impact and collision sensors used to deploy front and side impact airbags in modern passenger cars and trucks.” ’769 patent, at 1:43-45. The ’769 patent explains that “[i]n applications that depend on sudden and drastic deceleration, the presence of gravity is of little consequence and will not affect the implementation of the accelerometer.” ’769 patent, at 1:46-48. Nranian Decl., at ¶ 29.

21. That was not necessarily the case with then-emerging vehicle feedback systems. According to the specification of the Vehicle Control and Safety Patents, “feedback systems within motor vehicles have attempted to make use of accelerometer data during much lower and subtler levels of acceleration.” ’769 patent, at 1:48-51. For instance, some of the then-newer types of vehicular monitoring, control, and safety systems were known as anti-collision warning systems.

’769 patent, at 1:52-63. The specification of the ’769 patent highlights the technologies disclosed in U.S. Patent No. 6,411,204 (“Bloomfield”) as an example of one of these systems. *Id.* The ’769 patent explains that although “all street legal motor vehicles have brake lamps configured to signal other drivers of braking, these signals do not warn following drivers of imminent braking.” *Id.* According to the specification, Bloomfield “proposed activating a vehicle’s brake lamp system in response to a deceleration signal from a sensitive accelerometer, and independent of actuation of the brake pedal.” *Id.*; Nranian Decl., at ¶ 30.

22. Although systems of this type attempted to increase the effectiveness of vehicular safety systems by warning drivers of quick deceleration absent any actuation of the brake pedal (such as in an accident), those types of technologies had problems. Specifically, “the system fails to precisely account for gravitational forces, limiting its effectiveness to deceleration regimes where gravity’s effect is minimal and reducing its effectiveness as an early warning system.” ’769 patent, at 1:64-63; Nranian Decl., at ¶ 31.

23. Due to the extreme sensitivity of accelerometers to any gravitational force to which they are not perpendicular, any system that attempts to detect low levels of acceleration by using accelerometers within moving vehicles are subject to complications. ’769 patent, at 2:3-63. For instance, “the system must account for the wide variety of orientations of the accelerometer relative to the earth’s gravity introduced as the vehicle travels uphill, downhill, through cambered or off camber curves, and on cambered grades.” ’769 patent, at 2:3-9. As an example, “an accelerometer in a vehicle stopped on a 45-degree downhill slope would sense deceleration of a magnitude equal to 0.71 times the acceleration due to gravity.” ’769 patent, at 2:9-12; Nranian Decl., at ¶ 32.

24. The Bloomfield system attempts to avoid gravitational artifacts by “only produc[ing] output if the deceleration signal rises above a predetermined threshold set above the level of

artifacts introduced during typical driving conditions." '769 patent, at 2:12-17. As noted by the Vehicle Control and Safety Patents, the approaches of then-existing systems to deal with such complications (*e.g.,* gravitational acceleration artifacts) were problematic. For instance, "the reliance of [such] device[s] on a threshold deceleration reduces its effectiveness as an early warning system" because "[e]ven a short delay between the time when the subject vehicle begins to slow down and the time when a following vehicle begins to slow can result in a rapid closure of the gap, or following distance, between the vehicles, and a potential collision." '769 patent, at 2:18-24. This was a meaningful problem, of course, because "the shorter the following distance between vehicles, the smaller the margin of error will be for drivers of following vehicles to avoid rear-end collisions" and "[d]isengaging the accelerator, or coasting, is often the first response of the driver of a subject vehicle to observing a non-urgent traffic event in the roadway ahead, and usually results in a slight deceleration." '769 patent, at 2:24-30; Nranian Decl., at ¶ 33.

25. Accordingly, these then-existing systems operated in a way that would cause the monitoring and control "device to lose[] valuable time" in "warn[ing] other drivers of the possible imminence of braking of a subject vehicle." '769 patent, at 2:30-32. In order to avoid this problem, the deceleration "threshold must be set lower, which could result in gravitational acceleration artifacts affecting the systems output." '769 patent, at 2:32-35. This can create a whole set of problems, not the least of which include the device giving false positives (acceleration shown when going down a hill) and false negatives (no deceleration shown when going up a hill) due to the above-mentioned gravitational artifacts. '769 patent, at 2:35-40. Additionally, "[m]odern drivers respond quickly to rear brake warning lamps" and "following distances on modern roadways are often inadequate." '989 patent, at 20:19-25; Nranian Decl., at ¶ 34.

26. For some applications, the loss of time incurred by a "threshold-based system might

be tolerable," but that is not the case in collision prevention applications, where "even an instant saved can prevent a collision." '769 patent, at 2:41-43. To illustrate the scale of the problem, the '769 patent specification specifically cites a "[s] Special Investigative Report issued in January of 2001 by the National Transportation Safety Board (NTSB)." In that Report, the NTSB noted "that in 1999 '1.848 Million rear-end collisions on US roads killed thousands and injured approximately one Million people'" and "concluded that even a slightly earlier warning could prevent many rear-end collisions." '769 patent, at 2:43-50. According to the Report,

> Regardless of the individual circumstances, the drivers in these accidents were unable to detect slowed or stopped traffic and to stop their vehicles in time to prevent a rear-end collision. If passenger car drivers have a 0.5-second additional warning time, about 60 percent of rear-end collisions can be prevented. An extra second of warning time can prevent about 90 percent of rear-end collisions.

'769 patent, at 2:51-60 (citing NTSB Special Investigative Report SIR-01/01, *Vehicle- and Infrastructure-based Technology for the Prevention of Rear-end Collisions*); Nranian Decl., at ¶ 35.

27. Also, most importantly, there are numerous vehicle crashes involving death and serious injury that are caused due to distracted driving (texting, cell-phone use, and/or intentional or unintentional driver behavior (falling asleep at the wheel, stroke or heart attack, or lack of attention or lack of compensation for environmental and/or road conditions and surrounding vehicles and objects) for which human error and/or lack of ability of timely human perception and response is the cause. These dangerous and deadly events can be mitigated and/or avoided with proper potential crash and collision warnings and effective crash and collision avoidance, as well as crash and collision severity mitigation. Furthermore, the occupant injury severity and number of deaths from vehicle crashes of numerous potential crash and collision events can now be mitigated through the proper use of automatic collision and crash avoidance and warning systems

that automatically warn and/or automatically sense and actuate various vehicle systems (braking, warnings, suspension, ride and handling, idle vehicle shutdown, roll-back) as described and claimed in the Asserted Patents. Humans are not capable of monitoring and accurately measuring all of these vehicle dynamic forces, moments, and moments of inertia, in real-time and then responding through proper vehicle braking, steering, and maneuvering for all potential collision and crash events (including front, side, and rollover collisions and automotive, truck, car, pedestrian, bicycle, and motorcycle collisions). Nranian Decl., at ¶ 36.

28. Also, a human is not capable of adjusting vehicle suspension and individual wheel parameters in real-time based on measured real-time inputs from the sensors (*e.g.*, accelerometers, speed sensors, gyroscopes) as described and claimed in the Asserted Patents. If humans could do this perfectly for all potential weather, road, and surrounding conditions and circumstances, there would be no deaths and no injuries from vehicle traffic collisions. The Asserted Patents and their claims cannot be performed mentally by a person and cannot be carried out with a piece of paper and a pencil. For example, a person of skill in the art has never witnessed a person telepathically controlling adjustable suspension components for individual wheels in real time while driving around a corner at high rates of speed. A person of skill in the art has witnessed rear-end collisions because of distracted driving and failure to brake in a timely manner due to the driver's inability to perceive and react in time. People of skill in the art have witnessed and forensically evaluated numerous deadly vehicle roll-over events due to the inability to control vehicles while steering and maneuvering around turns and corners (which, for example, causes instantaneous changes to the vehicle's dynamics and alters how mass is distributed relative to the active rotation axis during the maneuver. This also alters the vehicle's effective resistance to rotation due to weight transfer, suspension motion, and other factors, that in many real-world situations, are beyond human mental,

perceptive, and reactive capabilities, leading to accidents and crashes because humans cannot accurately compensate to these instantaneous dynamically changing conditions fast enough to prevent these accidents and crashes). Through proper warnings and automatic control of vehicle components (through inputs from sensors, accelerometers, and gyroscopes that control braking, warning, and suspension components for proper compensation to dynamic conditions), the number of injuries, deaths, and injury severity will be mitigated. The Asserted Patents mitigate these deadly and severe problems as known in the prior art and do so through tangible vehicle components and systems. These are not abstract concepts. These are not mental concepts readily performed in the human mind. Nranian Decl., at ¶ 37.

29. There was therefore a need for systems that provided effective collision warnings and effective crash and collision avoidance, as well as crash and collision severity mitigation, and occupant injury and death mitigation, that could also account for deceleration, driver, and vehicle behavior (including surrounding vehicles and egocentric (*e.g.*, distracted driving)), vehicle and road forces (such as stopping, turning, cornering, changes in road surface, inclination, friction conditions, and weather), while decoupling any such measurements from the force of gravity or effect of grades or camber, without decreasing the sensitivity, and widening the calibration thresholds of these safety systems, which must perform within manufacturing and vehicle tolerances for all temperature and environmental conditions without decreasing the all-around performance of these safety systems. Nranian Decl., at ¶ 38.

**THE CLAIMED ADVANCES OF THE VEHICLE CONTROL AND SAFETY PATENTS.**

30. The specification makes clear that, in the context of the Vehicle Control and Safety patents, "'acceleration' refers to either or both positive acceleration and negative acceleration (sometimes called 'deceleration'), while 'deceleration' refers to only negative acceleration." '769 patent, at 2:64-67; Nranian Decl., at ¶ 39.

31. The Vehicle Control and Safety Patents are directed to inventive ways to monitor and control vehicles to improve driver safety through the novel use of accelerometers, coupled with gyroscopes and other sensors, to better warn of potential collisions and to prevent rollovers. More specifically, the Vehicle Control and Safety Patents are directed to "methods and devices for detecting absolute levels of longitudinal, lateral and vertical acceleration within moving vehicles, and to a variety of systems and methods for generating responses to changes in these absolute level" through the employment of accelerometer-gyroscopic other sensors. '769 patent, at 1:34-38. In simple terms, "[t]he present invention provides systems and methods for warning drivers of other vehicles of any possibility that a subject vehicle will brake and/or that the following vehicle may need to decelerate." '769 patent, at 3:1-4; Nranian Decl., at ¶ 40.

**The '769 Patent And '558 Patent Specification And Disclosures**

32. The specifications of the '769 patent and '558 patent generally disclose seven examples of the claimed inventions. *See* '769 patent, at 6:26-15:40 (describing examples of seven systems that can be deployed using the technologies of the Vehicle Control and Safety Patents). For purposes of this explanation, the focus will be on the embodiments to which the '769 patent and '558 patent are generally directed: those embodiments associated with the **collision warning systems** and the **anti-rollover systems**, which are color coded **blue** and **green**, respectively, below. Nranian Decl., at ¶ 41.

33. The Vehicle Control and Safety Patents sense/determine lateral acceleration, and in some embodiments, employ a gyroscope for measuring a heading or lateral inclination, in conjunction with an accelerometer, claimed in an accelerometer-gyroscopic sensor, in accordance with the inventions of the patents. '769 patent, at 4:18-32; Nranian Decl., at ¶ 42.

34. To start, the specification provides clear disclosure of an accelerometer sensor and gyroscopic sensor, including Figures 1 and 2, which are employed in the claimed **collision**

**warning systems** and **anti-rollover systems**.




Nranian Decl., at ¶ 43.

35. **Figure 1B** and **Figure 2C** (in the green box, above) show embodiments of the inventions of the Vehicle Control and Safety Patents that are directed to **collision warning systems that use the claimed accelerometer sensor /gyroscopic sensor to detect, in addition to acceleration, longitudinal inclination (to account for going up and down hills)**. ’769 patent, at 4:66-5:18. With reference to these figures, the specification explains that **Figure 1B** and **Figure 2C** (in the green box, above) show a “dual axis accelerometer and an electronic gyroscope positioned upon a moving body (not shown) having a pitch axis and a yaw axis that form a pitch yaw plane.” ’769 patent, at 4:66-5:4. The specification then explains the placement of the first axis and second axis of the accelerometer such that that “the two axes of the accelerometer form a longitudinal vertical plane orthogonal to the pitch-yaw plane.” ’769 patent, at 5:4-12. It then teaches that “[t]he gyroscope in [**Figure**] **2C** is mounted parallel to the longitudinal-vertical plane of the accelerometer and thus is also along a plane perpendicular to the pitch-yaw plane of the moving body” so it can “sense an inclination of the movement vector of the moving body relative

to the gravitational acceleration acting on the body." '769 patent, at 5:13-18; Nranian Decl., at ¶ 44.

36. With reference to **Figures 1A** and **Figure 2B** (in the blue box, above), the specification describes embodiments of the inventions of the Vehicle Control and Safety Patents that are directed to **anti-rollover systems that use the claimed accelerometer sensor/gyroscopic sensor to detect, in addition to acceleration, lateral inclination to account for gravity, grades, and camber by sensing axis angulation (to account for a car turning or rolling)**. '769 patent, at 5:19-35. According to the specification, "[t]he orientation shown in [**Figure**] **1A** allows for detection of lateral acceleration." '769 patent, at 5:20-22. "In [**Figure**] **1A**, a single axis accelerometer configured with a first axis, termed the lateral axis, parallel to the pitch axis senses lateral acceleration of the body, *e.g.*, acceleration in a plane orthogonal to the longitudinal-vertical plane." '769 patent, at 5:22-26. The specification teaches that "[w]hen the body does undergo a lateral acceleration, its actual movement is no longer along the desired movement vector," and accordingly, "during lateral acceleration, another gyroscope can be included to sense the inclination of the component of the actual movement vector that lies along the lateral axis." '769 patent, at 5:27-31. The specification then explains that "[**Figure**] **2B** depicts a gyroscope configured parallel to the pitch yaw plane and thus configured to detect an inclination of the component of movement that lies along the lateral axis, termed the lateral inclination of the body." '769 patent, at 5:32-35; Nranian Decl., at ¶ 45.

37. By employing the claimed accelerometer sensor and/or gyroscopic sensor, coupled with other claimed components and systems, the Vehicle Control and Safety Patents provide inventive systems and methods "for warning drivers of the possibility that another vehicle will brake and/or that the following vehicle may need to decelerate." '769 patent, at 3:1-5. The

inventions of the Vehicle Control and Safety Patents "also provide[] systems that adjust suspension of a vehicle while turning" in response to data from an accelerometer and gyroscope. '769 patent, at 4:11-15; Nranian Decl., at ¶ 46.

38. Figures 3 through 9 show exemplary structures of the methods and systems claimed in the Vehicle Control and Safety Patents. As noted above, the actual claims of each of the Vehicle Control and Safety Patents claim subject matter that are slightly different from each other, and in fact, the claims of the '769 and '558 patents are generally directed at different embodiments of the inventions disclosed in the patents. Nranian Decl., at ¶ 47.

39. In line with the color-coding scheme used above, these embodiments that are associated with the '769 patent and the '558 patent are color coded **blue** and **green**, respectively. For instance, the claims of the '769 patent are generally directed to the embodiments disclosed at **Figure 4** and **Figure 8**, and accompanying text, which describe the detection of "lateral acceleration" (as described in **Figure 1A** and **Figure 2C** and the activation of the suspension to, *i.e.*, counteract lateral movement of the vehicle. '769 patent, at 4:18-32; 11:37-12:52 (specification section entitled "Anti-Rollover Systems"). According to the specification, Figure 4 "illustrates a schematic view of an anti-rollover system in accordance with an embodiment of the present invention." '769 patent, at 4:45-47. "[**Figure**] **8** illustrates a schematic view of an anti-rollover system in accordance with an embodiment of the present invention." '769 patent, at 4:56-58. Below, the accelerometer sensor and/or gyroscopic sensor are identified by superimposing a **purple box** on Figures 4 and 5.




Fig. 4




Fig. 8

Nranian Decl., at ¶ 48.

40. Likewise, the claims of the '558 patent are directed at the embodiments described in **Figures 3A, 3B, and 3C** and **Figure 9**. "[**Figure**] **3A** is a schematic view illustrating the components of the rear-end collision avoidance system, warning drivers of a subject vehicle's deceleration, in accordance with an embodiment of the present invention. Similarly, [**Figure**] **9** is a schematic view illustrating the components of the rear-end collision avoidance system, warning drivers of a subject vehicle's deceleration, in accordance with the preferred embodiment of the present invention."




Fig. 3A




Fig. 9

Nranian Decl., at ¶ 49.

41. **Figure 3B** and **Figure 3C** (not pictured here) are "state machine diagrams" of two of the collision warning systems, which illustrate algorithms associated with the claimed systems. *See* '769 patent, at 4:39-44:4; Nranian Decl., at ¶ 50.

**<u>The '821 Patent And '520 Patent Specification And Disclosures</u>**

42. The '821 and '520 patents are directed to inventive ways to monitor and control vehicles to improve driver safety through the novel use of pointable range finders to calculate a distance between a vehicle and an object, a recorder for recording a status of the vehicle and a control device. '821 patent, Abstract. In simple terms, "[t]he present invention provides systems and methods for warning drivers of other vehicles of any possibility that a subject vehicle will brake and/or that the following vehicle may need to decelerate. This warning occurs earlier than warnings provided by traditional rear brake warning systems." '821 patent, at 3:33-38; Nranian Decl., at ¶ 51.

43. The specification of the '821 and '520 patents generally disclose eight examples for the use of the claimed inventions. *See* '821 patent, at 8:11-30:11 (describing examples of eight systems that can be deployed using the technologies of the Vehicle Control and Safety System Patents). For purposes of this explanation, the focus will be on the embodiment to which the '821 patent and '520 patent are generally directed: those embodiments associated with the collision warning systems and unsafe event identification and recording. Nranian Decl., at ¶ 52.

44. The '821 and '520 patents utilize a communication system for a vehicle that comprises a pointable range finder to calculate a distance between a vehicle and an object, a recorder that records an operation status of the vehicle, and a control device coupled to the range finder and the recorder. The range finder sends a signal to the control device that corresponds with the vehicle's distance from the object, and the control device operates the recorder, based upon the

signal sent from the range finder in order to indicate whether the vehicle has entered a safe-zone threshold with respect to the object based on the vehicle's speed and distance from the object. '821 patent, at 3:64-4:5; Nranian Decl., at ¶ 53.

45. To start, the specification provides clear disclosure of a range finder, recorder, and control device, among components, in Figures 14-16, which are employed in the claimed collision warning systems, as discussed below, and are "schematic view[s] illustrating the components of" the rear-end collision avoidance system and communication system. '821 patent, 6:32-40; Nranian Decl., at ¶ 54.

46. With reference to Figure 14, the communication system 1400 comprises a range finder 1485, a vehicle speed sensor (VSS) 1410, a control device 1445, and a response device activation circuit 1475. The VSS 1410 emits a period function with a frequency corresponding to the speed of the vehicle and sends a signal to the control device 1445. The range finder 1485 calculates a distance from the vehicle to an object and sends a signal to the control device 1445. Based upon the signal from the VSS 1410 and the range finder 1485 the control device 1445 sends a signal to the response device activation circuit 1475, which operates a response device in a manner dependent upon the signal sent from the control device 1445. '821 patent, at 15:35-50; Nranian Decl., at ¶ 55.

47. As also shown in Figure 14, in some embodiments, the communication system 1400 comprises a speed control system activation circuit 1465 coupled to the control device 1445. In these embodiments, after receiving a signal the VSS 1410 and the range finder 1485, the control device 1445 sends a signal to the speed control system activation circuit 1465, which is able to control the speed of the vehicle in a manner dependent on the signal from the control device 1245. For example, in some embodiments, the control device 1445 activates the speed control system

activation circuit 1465 to activate the braking system in order to slow the vehicle in order to increase the space between the vehicle and a lead vehicle. In some embodiments, the control device 1445 activates the speed control system activation circuit 1465 to activate the braking system in order to maintain a safe distance between the following vehicle and the lead vehicle. In further embodiments, the control device 1445 activates the speed control system activation 1465 to increase the speed of the following vehicle in order to maintain a consistent distance between the following vehicle and the lead vehicle. The control device 1445 can also activate the speed control system activation circuit to increase the speed of the leading vehicle based on an excessive closure rate of a following vehicle. ’821 patent, 17:52-18:9; Nranian Decl., at ¶ 56.

48. Additionally, the communication system 1400 can comprise the speed control system activation circuit 1465 and a response device activation circuit 1475 that is coupled to the control device 1445. ’821 patent, 18:10-13.




Fig. 14

Nranian Decl., at ¶ 57.

49. With reference to Figure 15, the communication system 1500 comprises a vehicle speed sensor (VSS) 1510, a control device 1545, and a warning device activation circuit 1595. The VSS emits a periodic function with a frequency corresponding to a speed of the vehicle and sends a signal to the control device 1545. The control device 1545 processes the signal it receives from the VSS 1510 and determines whether to activate a warning device. The control device 1545 is coupled to and sends a signal to the warning device activation circuit 1595, which activates the warning device in a manner based on a signal from the control device 1545. The control device 1545 sends a signal to the warning device activation circuit 1595 to activate a warning device after the vehicle reaches a predetermined rate of speed. For example, the control 1545 sends a signal to the warning device activation circuit 1595 when the vehicle reaches a speed of 35 miles per hour. ’821 patent, at 18:42-62; Nranian Decl., at ¶ 58.

50. As further shown in Figure 15, the communication system further comprises a range finder 1585. The range finder 1585 calculates a distance from the vehicle to an object and sends a signal to the control device 1545. The range finder 1585 calculates the distance from the vehicle to an object and based upon the signal from VSS 1510 and the range finder 1585, the control device 1545 sends a signal to the warning device activation circuit 1595. ’821 patent, 19:11-21; Nranian Decl., at ¶ 59.

51. The range finder 1585 can calculate the distance from a vehicle to a leading vehicle. The control device 1545 sends a signal to the warning activation circuit 1595, which activates the warning device based upon the vehicle’s speed and the distance of the vehicle from the leading vehicle. The range finder 1585 can be pointable in an upward, diagonally upward, or in a direction to the side of the vehicle to calculate the distance between a vehicle and an object, such as a

stoplight, stop sign, intersection, or area of congestion. ’821 patent, 19:22-45.




**Fig. 15**

Nranian Decl., at ¶ 60.

52. With reference to Figure 16, the communication system 1600 comprises a pointable range finder 1685, a recorder operation circuit 1610 and a control device 1645. The range finder 1685 functions similarly to the range finder described above in Figure 14 and calculates the distance between a vehicle and an object, such as a leading vehicle. ’821 patent, 20:34-41. The range finder 1685 may comprise an accelerometer to determine the direction and degree of turn of the vehicle when the leading vehicle is turning. ’821 patent, 20:58-60; Nranian Decl., at ¶ 61.

53. The control device 1645 receives a signal from the VSS corresponding to a speed of the vehicle and a signal from the range finder 1685 corresponding to the vehicle’s distance from the object. After receiving the signal from the VSS 1610 and the range finder 1645, the control device 1645 compares the values to the programmed constant and sends a signal to the recorder

operation circuit 1670 and/or the speed control activation circuit. If the vehicle is an unsafe distance from the object, a signal to the recorder operation circuit 1670 will record the instance. The communication system 1600 also comprises a response device activation circuit 1475, as discussed above for Figure 14. ’821 patent, 21:34-44, 47-52; Nranian Decl., at ¶ 62.

54. Also shown in Figure 16, the communication system 1600 comprises vehicle speed sensor (VSS) 1610. VSS 1610 emits a periodic function with a frequency corresponding to the speed of the vehicle and sends a signal to the control device 1645. Based on the signal from VSS 1610 and the range finder 1685, the control device 1645 sends a signal to recorder operation activation circuit 1610, which operates the recorder based on the signal sent from the control device 1645, as discussed above. Through this, the communication system 1600 can record additional conditions surrounding the safe zone encroachment event, such as the traveling and closing speed of the vehicle. ’821 patent, 22:11-35. A speed control activation circuit 1665 may also be coupled to the control device 1645; doing so allows the control system activation circuit 1665 to control the vehicle’s speed based on the signal sent from the control device 1645. *Id.* at 22:27-35.




Fig. 16

Nranian Decl., at ¶ 63.

**The ’989 Patent Specification And Disclosures**

55. The specification of the ’989 patent generally discloses nine examples of the claimed inventions. *See* ’989 patent, at 8:15-39:26 (describing examples of nine systems that can be deployed using the technologies of the ’989 patent). For purposes of this explanation, the focus will be on the embodiment to which the ’989 patent is generally directed: anti-rollover systems. Nranian Decl., at ¶ 64.

56. The ’989 patent utilizes a vehicle monitoring system comprising an accelerometer for detecting a lateral acceleration of a vehicle, a speed reduction activation circuit and a control device, wherein the control device receives a signal from the accelerometer and sends a signal to the speed reduction activation circuit based upon the signal from the accelerometer. ’989 patent,

at 4:9-15; Nranian Decl., at ¶ 65.

57. To start, the specification provides clear disclosure of an accelerometer, speed reduction circuit, and control device, among other components, in Figures 25-26, which are employed in the claimed vehicle monitoring systems, as discussed below, and include "a schematic view illustrating the components of" a vehicle monitoring system for a vehicle that monitors a lateral acceleration of a vehicle. '821 patent, 6:38-43; Nranian Decl., at ¶ 66.

58. With reference to Figure 25, the vehicle monitoring system 2500 comprises an accelerometer 2510 for detecting a lateral acceleration of the vehicle, a speed reduction circuit 2550, and a control device 2540. The accelerometer 2510 sends a signal to the control device 2540 corresponding to a lateral acceleration of the vehicle. The control device 2540 processes the signal from the accelerometer 2510 and sends a signal to the speed reduction activation circuit 2550. The control device 2540 receives a signal from the accelerometer that the lateral speed of the vehicle is greater than a threshold value. In response, the control device 2540 sends a signal to the speed reduction activation circuit 2550 to reduce the traveling speed of the vehicle. The control device can also send a signal to a performance warning system activation circuit to activate a performance warning, such as a warning that the vehicle is traveling too fast as it is rounding a turn. '989 patent, at 37:36-54; Nranian Decl., at ¶ 67.

59. The accelerometer 2510 sends a signal based upon the lateral deceleration of the vehicle. If the lateral acceleration is greater than a threshold value, the control device 2540 sends a signal to the speed reduction activation circuit to reduce the vehicle's speed, such as by reducing the vehicle's engine propulsion or slowing the drive wheel vehicle. '989 patent, 37:55-64.\; Nranian Decl., at ¶ 68.

60. The accelerometer 2510 can be configured to detect a gross lateral acceleration of

the vehicle and send a signal to the control device 2540 corresponding to the gross lateral acceleration. The control device 2540 processes the signal from the accelerometer 2510 and outputs a net lateral acceleration. Based upon the net lateral acceleration, the control device 2510 sends a signal to the speed reduction activation circuit 2550. '989 patent, 38:3-10.




Fig. 25

Nranian Decl., at ¶ 69.

61. Figure 26 illustrates a method of monitoring a vehicle. The method begins at step 2610. At step 2620, a lateral acceleration of a vehicle is detected. At step 2630, it is determined whether the lateral acceleration value is greater than a threshold value. If the lateral acceleration is greater than the threshold value, then the vehicle's speed is reduced at step 2640. If the lateral acceleration is greater than the threshold value, then an alert can also be issued.




**Fig. 26**

Nranian Decl., at ¶ 70.

62. The methods and systems disclosed on the Vehicle Control and Safety Patents provide for earlier warnings than those "warnings provided by traditional rear brake warning systems" and takes "advantage of the [then-]existing conditioning of modern drivers to respond quickly to rear brake warning lamps by using these systems to convey new deceleration warnings." '769 patent, at 3:4-9; Nranian Decl., at ¶ 71.

63. The present inventions also relate to devices that overcome the limitations of the prior art by integrating the signals from pulse or sine wave generators [commonly referred to a vehicle speed sensors], which are directly related to vehicle distance traveled." '769 patent, at

3:10-15. "Most [then-]modern vehicles are shipped with an electronic [speed sensor] as standard equipment," which "communicates with the vehicle's electronic control module (ECM) and speedometer to display the speed of the vehicle to an operator." '769 patent, at 3:15-20; Nranian Decl., at ¶ 72.

64. Unlike the prior art systems (*see supra*), the inventions of the Vehicle Control and Safety Patents precisely account for gravitational forces, grades, and other orientations that limited the effectiveness of pre-existing collision warning and anti-rollover systems. The Vehicle Control and Safety Patents disclose systems and methods that provide effective collision warnings that account for deceleration while decoupling any such measurements from the need to account for the force of gravity or effect of grades without decreasing the sensitivity or threshold triggers of the system. By incorporating accelerometer sensors and/or gyroscopic sensors as part of a system for warning a driver of potential deceleration in front of them and as part of a system to control the driver's suspension, the claimed inventions disclosed systems and methods for vehicular monitoring and control that were significantly safer than pre-existing systems. These systems as disclosed in the Vehicle Control and Safety Patents provided effective collision warnings and effective crash and collision avoidance, as well as crash and collision severity mitigation, and occupant injury and death mitigation, that also could account for deceleration, driver, and vehicle behavior (including surrounding vehicles and egocentric behavior (*e.g.*, distracted driving)), vehicle and road forces (such as stopping, turning, cornering, changes in road surface, inclination, friction conditions, and weather), while decoupling any such measurements from the force of gravity or effect of grades or camber, without decreasing the sensitivity, and widening the calibration thresholds of these safety systems, which must perform within manufacturing and vehicle tolerances for all temperature and environmental conditions without decreasing the all-

around performance of these safety systems. Nranian Decl., at ¶ 73.

65. The present inventions also provide a warning for rollback, which occurs, for example, when a vehicle rolls down a hill backwards. ’821 patent, at 12:13-17, 56-60; Nranian Decl., at ¶ 74.

66. In use, the claimed communication system enables an alerting device placed within a leading vehicle to transmit information to a receiver placed within a following vehicle in a non-visual manner. In doing so the lead vehicle transmits information such as actual speed, braking status, and deceleration discreetly and without interference. The communication system has the advantage of allowing users to transmit and receive vehicle speed information in a more direct manner without using conventional brake lamps or other conventional stop lamps. Additionally, the communication system enables a following vehicle to maintain a consistently safe distance from a leading vehicle. Accordingly, the communication system has many advantages over the prior art. ’821 patent, 15:13-26; Nranian Decl., at ¶ 75.

67. The communication system provides a warning which supplements conventional warning systems and indicates potential unsafe potential driving conditions or slowing traffic. By warning of an excessive closure rate, and an unsafe following distance, the speed of a vehicle may be increased or decreased in order to make driving conditions safe. In addition, in some embodiments, the communication system has the advantage of generating a warning which is tailored to the specific speed of the vehicle and the ideal stopping distance at that speed. Moreover, in some embodiments, by implementing the system entirely within one vehicle, the vehicle is not dependent upon other warning systems in the event of a malfunction or failure of those systems. *See* ’821 patent, 18:26-34, 19:46-51; Nranian Decl., at ¶ 76.

68. “One novel and distinguishing feature of this invention is that the subject vehicle’s

communication system warns other vehicles of any possibility that the subject vehicle will begin to brake. This is so because any engagement of the brake pedal is usually immediately preceded by a disengagement of the throttle." '821 patent, 19:66-20:4; Nranian Decl., at ¶ 77.

69. Regarding the anti-rollover systems and dynamic suspension adjustment systems, when lateral acceleration or force is applied to a vehicle, it tends to lean in the direction opposite to the force being applied, due in part to the softness of their suspension systems. This moves the center of gravity further off center and in some cases outside of their wheelbase approaching the critical rollover point. Stiffening the outside suspension and/or loosening the inside suspension keeps the center of gravity of vehicles within a tighter envelope relative to the wheelbase. This inversely affects the propensity, especially when the center of gravity of their load exceeds the wheelbase and reaches the critical rollover point. Additionally, by adjusting the suspension system in this manner the distribution of load between the left and right side wheels are kept more even resulting in improved traction. '821 patent, 24:13-27, 27:27-41; Nranian Decl., at ¶ 78.

70. Thus, this invention provides an earlier warning to the driver of the following vehicle of a subject vehicle's intent to decelerate than was available in modern vehicles, which only provide systems that actuate warning lamps if the driver depresses the brake pedal or if an accelerometer unit detects a threshold deceleration. Modern drivers respond quickly to rear brake warning lamps, conditioning that the present invention takes advantage of by using these warning systems to convey new and broader warnings. Since following distances on modern roadways are often inadequate, this arrangement could prevent numerous rear-end collisions. '989 patent, 20:5-16; Nranian Decl., at ¶ 79.

71. Additionally, the customizable control module and communication systems are able to be configured with a plurality of data sensors and one or more alerting devices. The control

module and communication systems are 100% autonomous and provide automatic control of the plurality of data sensors and alerting devices. In doing so, the control module and systems automatically provide data and safety alerts to the driver of the vehicle as well as the surrounding vehicles. Accordingly, the control module and communication systems have many advantages over the prior art. '989 patent, 39:8-18, 25-26; Nranian Decl., at ¶ 80.

## THE ACCUSED PRODUCTS

72. Based upon public information, Defendant owns, operates, advertises, and/or controls the website www.tesla.com through which it advertises, sells, offers to sell, provides and/or educates customers about its products.[3]

73. Defendant offers at least the following products (hereinafter, the "Accused Products") that are incorporated into certain Tesla vehicles and that infringe one or more claims of at least one of the Asserted Patents:

- Tesla Adaptive Suspension Damping;
- Tesla Autopilot; and
- Tesla Traction and Stability Control.

74. Defendant offers to its customers information about how to use the Accused Products.[4]

---

[3] *See* https://www.tesla.com/ and https://www.tesla.com/current-offers (last visited September 17, 2025)

[4] *See e.g.,*

Tesla Model S Owner's Manual (2025+) at https://www.tesla.com/ownersmanual/models/en_us/Owners_Manual.pdf (last visited September 18, 2025)

Tesla Model S Owner's Manual (2012-2020) at https://www.tesla.com/ownersmanual/2012_2020_models/en_us/Owners_Manual.pdf (last visited September 18, 2025)

## COUNT I: INFRINGEMENT OF U.S. PATENT NO. 8,315,769

75. Plaintiff re-alleges and incorporates by reference each of paragraphs 1-74 above as though fully set forth in their entirety.

76. U.S. Patent No. 8,315,769 (the "'769 patent") was issued on November 20, 2012 after full and fair examination by the USPTO of Application No. 13/302,965 which was filed on November 22, 2011. The '769 patent is entitled "Absolute Acceleration Sensor For Use Within Moving Vehicles." *See* '769 patent at p. 1.

77. Vision Works owns all substantial rights, interest, and title in and to the '769 patent, including the sole and exclusive right to prosecute this action and enforce it against infringers and to collect damages for all relevant times.

78. Vision Works or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the '769 patent.

79. The written description of the '769 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

### SUBJECT MATTER ELIGIBILITY

80. The claims of the '769 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include

Tesla Model Y Owner's Manual at https://www.tesla.com/ownersmanual/modely/en_us/Owners_Manual.pdf (last visited September 18, 2025)

inventive components that control a vehicle's performance by continuously updating the suspension of a vehicle for optimum performance based on the lateral acceleration of the vehicle's body when cornering.

81. As noted in the beginning of this section, the relevant '769 patent claims are directed to physical devices that employ sensors (*e.g.*, accelerometer sensors and/or gyroscopic sensors), a vehicle suspension, and controllers for the same, such that the suspension can be adjusted in response to deceleration and/or changes in road conditions. In various forms, the devices, systems, and methods claimed in the '769 patent identify lateral acceleration of the vehicle (*e.g.*, using accelerometer sensors and/or gyroscopic sensors) and can adjust the suspension of the vehicle in response to those signals to improve safety and control over the vehicle. Nranian Decl., at ¶ 84.

82. Specifically, the '769 patent contains a total of 29 claims (three independent and twenty-six dependent), all directed to the foregoing devices, systems, and methods. For example, claims 1, 9, and 21 of the '769 patent are recited below, and some of the more important elements of the claims are bolded and italicized for emphasis:

> **Claim 1.** A ***device for a vehicle***, comprising:
>
> ***an accelerometer-gyroscope*** for sensing an ***absolute lateral acceleration***;
>
> ***a suspension selector***; and
>
> a plurality of ***controllers*** for individually ***controlling one or more suspension systems of the vehicle***.
>
> **Claim 9.** ***A system*** for controlling the performance characteristics of a vehicle comprising:
>
> ***an accelerometer-gyroscope*** for sensing an ***absolute lateral acceleration*** of the vehicle;

> a ***suspension selector*** that ***receives a signal from the accelerometer-gyroscope based upon the absolute lateral acceleration*** of the vehicle;
>
> a plurality of ***controllers that receive a signal from the suspension selector*** based upon the ***signal received from the accelerometer-gyroscope***; and
>
> ***one or more suspension systems that are individually activated by the one or more controllers*** based upon the ***signal received from the accelerometer-gyroscope***.
>
> **Claim 21**. A ***method of controlling the performance characteristics of a vehicle***, comprising:
>
> ***sensing a lateral acceleration*** of the vehicle at the vehicle;
>
> ***sending a signal to*** a plurality of ***control devices based upon the lateral acceleration*** of the vehicle; and
>
> ***adjusting a suspension*** characteristic of the vehicle ***based upon the lateral acceleration*** of the vehicle.

’796 patent at claims 1, 9, and 21 (emphasis added). I have also recited some examples of dependent claims to independent claims 1, 9, and 21, which provide:

> **Claim 4.** The device of claim 1, wherein the ***accelerometer-gyroscope sends a signal to the suspension selector*** based upon an ***absolute lateral acceleration*** of the vehicle and the ***suspension selector sends a signal to the one or more controllers based upon the signal received from the accelerometer-gyroscope***.
>
> **Claim 5.** The device of claim 4, wherein the ***one or more suspension systems adjust the suspension*** of the vehicle in order ***to move a center of gravity of the vehicle and more evenly distribute a load of the vehicle***.
>
> **Claim 6.** The device of claim 4, wherein the ***one or more suspension systems stiffen or loosen*** based upon a ***signal received from the*** one or more ***controllers***.
>
> **Claim 8.** The device of claim 7, wherein the one or more ***suspension systems are arranged into four quadrants***.

> **Claim 17.** The system of claim 9, wherein ***the accelerometer-gyroscope also senses a vertical acceleration***.
>
> **Claim 18.** The system of claim 17, further comprising a ***vehicle computer unit (VCU),*** wherein the VCU ***receives a signal from the accelerometer-gyroscope corresponding to a vertical acceleration*** of the vehicle and uses a baseline performance data ***to either self correct a performance characteristic of the vehicle or issue a warning***.
>
> **Claim 19.** The system of claim 18, wherein ***the VCU issues a warning that a tire pressure is low***.
>
> **Claim 20**. The system of claim 18, wherein the VCU ***issues a warning that one or more suspension shock absorbers of the vehicle are degraded***.

'796 patent at claims 4-6, 8, 17-20 (emphasis added). The remaining dependent claims add other features and/or are roughly identical to those presented above (*e.g.*, claim 12 is the same as claim 4; claims 13 and 22 are the same as claim 5; claims 14 and 23 are the same as claim 6; claims 16 and 25 are the same as claim 8; claim 26 is the same as claim 17; claim 27 is the same as claim 18; claim 28 is the same as claim 19; claim 29 is the same as claim 20). Nranian Decl., at ¶ 85.

83. The foregoing claim elements are both concrete and specific in the physical system they claim, and each of the claims is patentably distinct from each other in what they claim (as highlighted above). Independent claims 1, 9, and 21 are directed to, among other things, a system to solve problems in vehicle control and safety systems in October 2004 (*e.g.*, the inability to account for gravity, grades, or camber without impacting the sensitivity of safety systems like collision warning or anti-rollover systems), which prior systems could not accomplish. Nranian Decl., at ¶ 86.

84. None of the claims of the '796 patent (or any other Vehicle Control and Safety System Patent) are representative of any other. For instance, claim 1 is directed to, among other things, a physical device that uses an accelerometer-gyroscope for sending an absolute lateral

acceleration, along with a suspension selector and a plurality of controllers for adjusting the vehicle's suspension. The claims depending from claim 1 further assert a more specific version of the invention that include, for instance, where the accelerometer-gyroscope sends a signal to the suspension, which sends a signal to the suspension controllers based upon the lateral acceleration signal received (claim 4), where the suspension system adjusts the suspension to center the gravity of the vehicle to account for the lateral acceleration (claim 5), where the suspension systems stiffen or loosen based upon a signal received from the one or more controllers (claim 6), and where the suspension is arranged in four quadrants (claim 8). Nranian Decl., at ¶ 87.

85. Independent claim 9 claims a system for controlling performance through an accelerometer-gyroscope for sensing an absolute lateral acceleration of the vehicle coupled with a suspension that can receive a signal based on the absolute lateral acceleration and control the suspension through controllers that activate one or more suspension systems based on that signal. The dependent claims 10 to 20 claim more specific forms of the inventions. For instance, many of the claims depending on 9 include all of the same additional limitations to claim 1 (*e.g.*, claim 12 is the same as claim 4; claim 13 is the same as claim 5; claim 14 is the same as claim 6; claim 16 is the same as claim 8), but there are additional limitations, including where the accelerometer-gyroscope also senses a vertical acceleration (claim 17), where the system further includes a VCU that receives a signal from the accelerometer-gyroscope corresponding to a vertical acceleration in order to self-correct a performance characteristic or issue a warning (claim 18), and where the warning can indicate a low tire pressure (claim 19) or shock absorber degradation (claim 20). Nranian Decl., at ¶ 88.

86. Independent claim 21 claims a method of controlling the performance characteristics of a vehicle by sensing a lateral acceleration of the vehicle at the vehicle, sending a signal to a

plurality of control devices based upon the lateral acceleration, and adjusting a suspension characteristic based upon the same. The dependent claims 22 to 29 claim more specific inventions. For example, the claims depending on claim 21 include all of the same additional limitations present in those claims dependent to claim 9 (*e.g.*, claim 22 is the same as claim 5; claim 23 is the same as claim 6; claim 25 is the same as claim 8; claim 26 is the same as claim 17; claim 27 is the same as claim 18; claim 28 is the same as claim 19; claim 29 is the same as claim 20). Nranian Decl., at ¶ 89.

87. All of these claims are directed to solving the technical problems that existed with vehicle control and safety systems in October of 2004. They do so, among other ways, by sensing absolute lateral acceleration of the vehicle using, for instance, accelerometer sensors and/or gyroscopic sensors, to adjust the vehicles suspension using controllers that receive a signal (based on the lateral acceleration), and as a result, providing effective collision avoidance/warnings that account for deceleration without interference from the force of gravity, the effect of grades, or camber, and without decreasing the sensitivity or thresholds for detecting safety concerns. The other dependent claims add specific limitations that further improve then-existing vehicle control and safety systems by providing better control over the suspension, including for instance, by employing a VCU that receives a signal from the accelerometer-gyroscope corresponding to a vertical acceleration in order self-correct performance characteristics or issue a warning (where the system can warn of, for instance, low tire pressure or shock absorber degradation). Nranian Decl., at ¶ 90.

88. These systems as disclosed in the ’769 patent provided effective collision warnings and effective crash and collision avoidance, as well as crash and collision severity mitigation, and occupant injury and death mitigation, that also can account for deceleration, driver and vehicle

behavior (including surrounding vehicles and egocentric behavior (e.g., distracted driving)), vehicle and road forces (such as stopping, turning, cornering, changes in road surface, inclination, friction conditions, and weather), while decoupling any such measurements from the force of gravity or effect of grades or camber, without decreasing the sensitivity, and widening the calibration thresholds of these safety systems, which must perform within manufacturing, and vehicle tolerances, for all temperature and environmental conditions without decreasing the all-around performance of these safety systems. Nranian Decl., at ¶ 91.

89. The claims of the ’769 patent are not directed to a law of nature or other abstract ideas. For instance, the claims do not patent centrifugal force, any law of nature (even if it measures them to create improved vehicle safety systems) or any other abstract idea; it in fact does not even attempt to patent any well-understood, routine, or conventional activity. Nranian Decl., at ¶ 92.

90. The claims of the ’769 patent provide novel devices, systems, and methods for monitoring and controlling vehicles to increase safety by using lateral acceleration (in addition to, for instance, acceleration and deceleration) to adjust a vehicle suspension (in various ways) in order to provide effective collision avoidance/warnings that account for deceleration while backing out the force of gravity, or effect of grades or camber from acceleration measurements without decreasing the sensitivity or thresholds for detecting safety concerns. The claimed inventions include inventive components that provide an improved system for accounting for the force of gravity, effect of grades, and the impact of camber on acceleration measurements without decreasing the sensitivity of vehicle safety systems. A person skilled in the art would understand that each of the highlighted claims above provided a specific improvement in technical capabilities that did not exist prior to the priority date of the ’769 patent, and more specifically, allowed vehicle

control and safety systems to operate in a more sensitive and accurate manner, which was an improvement in the art. In other words, the inventions of the ’769 patent are directed to solving technical problems that were then known in the art. Nranian Decl., at ¶ 93.

91. The claims of the ’769 patent do not preempt all ways of accounting for the force of gravity, effect of grades, and the impact of camber on acceleration measurements in vehicle control and safety systems, much less all ways of improving safety in vehicle monitoring and control systems by adjusting the vehicle suspension in response to acceleration signals. There is a myriad of other ways such systems could be architected, including by practicing the systems of Bloomfield or detecting changes in vehicle acceleration using Hamlin Reed sensors. Indeed, any of the devices disclosed in the almost 100 prior art references on the face of the patent could be practiced without infringing the claims of the ’769 patent. Nranian Decl., at ¶ 94.

92. These claims also cannot be practiced in the human mind or with pen and paper. Most importantly, there are numerous vehicle crashes involving death and serious injury that are caused for example, due to distracted driving (*e.g.*, texting, cell-phone use, and/or intentional or unintentional driver behavior (*e.g.*, falling asleep at the wheel, stroke or heart attack, lack of attention or lack of compensation for environmental and/or road conditions and surrounding vehicles and objects), for which human error and/or lack of ability of timely human perception and response is the cause. These dangerous and deadly events can be mitigated and/or avoided with proper potential crash and collision warnings and effective crash and collision avoidance, as well as crash and collision severity mitigation. Furthermore, the occupant injury severity and number of deaths from vehicle crashes of numerous potential crash and collision events can now be mitigated through the proper use of automatic collision and crash avoidance and warning systems that automatically warn and/or automatically sense and actuate various vehicle systems (braking,

warnings, suspension, ride and handling) as described and claimed in the ’769 Patent. Humans are not capable of monitoring, and accurately measuring all of these vehicle dynamic forces, moments, and moments of inertia, in real-time and then responding through proper vehicle braking, steering, and maneuvering for all potential collision and crash events (including those involving front, side, rollover collisions, and those involving automotive, truck, car, pedestrian, bicycle, and motorcycle collisions). Also, for example, a human is not capable of adjusting vehicle suspension and individual wheel parameters in real-time based on measured real-time inputs from the sensors (*e.g.*, accelerometers, speed sensors, and gyroscopes) as described and claimed in the ’769 Patent. If humans could do this perfectly for all potential weather, road, and surrounding conditions and circumstances, there would be no deaths and no injuries from vehicle traffic collisions. The ’769 Patent and its claims cannot be performed mentally by a person and cannot be carried out with a piece of paper and a pencil. For example, people of skill in the art have never witnessed a person telepathically controlling adjustable suspension components for individual wheels in real time while driving around a corner at high rates of speed. A person of skill in the art has witnessed a vehicle roll-over event due to a driver’s inability to perceive and react in time. The ’769 Patent mitigates these deadly and severe problems as known in the prior art and do so through tangible components and systems. A person of skill in the art has witnessed and forensically investigated numerous roll-over events, and other events due to lack of vehicle control, improper steering, and lack of adequate driver compensation for changes in vehicle dynamics. Many of these events have involved death and serious injury. Many of these collisions and crashes were due to driver error, driver distraction, and lack of driver perception and reaction. The warning, roll-over, and crash avoidance systems, as described and claimed in the ’769 Patent, would serve to mitigate the number and effects of these events. Also, a person of skill in the art

has witnessed and forensically evaluated numerous deadly vehicle roll-over events, and other types of collisions, due to inability to control vehicles while steering and maneuvering around turns and corners (which, for example, causes instantaneous changes to the vehicle's dynamics and alters how mass is distributed relative to the active rotation axis during the maneuver; this also alters the vehicle's effective resistance to rotation due to weight transfer, suspension motion, and other factors that in many real-world situations are beyond human mental, perceptive, and reactive capabilities, leading to accidents and crashes because humans cannot accurately compensate to these instantaneous dynamically changing conditions fast enough to prevent these accidents and crashes). Through proper warnings and automatic control of vehicle components (through inputs from sensors, accelerometers, and gyroscopes that control warning, and suspension components for proper compensation to dynamic conditions), the number of injuries, deaths and injury severity will be mitigated. The '769 Patent mitigates these deadly and severe problems as known in the prior art and do so through tangible vehicle components and systems. These are not abstract concepts. These are not mental concepts readily performed in the human mind. Nranian Decl., at ¶ 95.

93. Even if the '769 patent claims were directed at a law of nature or any other abstract idea (and they are not), the claims capture subject matter that is inventive. The claims of the '769 patent are directed to matter that was not known in the art at the time and, to the extent that the claims employ components and technology that existed at the time (*e.g.*, accelerometers, gyroscopes, or controllers), they are employed together here in a way that was new (and would not have been considered conventional, routine, or generic to those skilled in the art). These claims are directed to specific solutions using technology in an inventive and unique way to improve vehicle safety by controlling a vehicle in response to lateral acceleration data and gyroscope data,

thereby controlling for the force of gravity, effect of grades, and the impact of camber without decreasing system sensitivity. In fact, a skilled artisan would know that the use of systems to sense lateral acceleration also includes real-time inputs from gyroscopic sensors for compensation (accounting for instantaneous potentially dangerous vehicle forces) to adjust the vehicle's suspension using controllers that receive signals based on these combined sensors as inputs in order to provide effective warnings and effective crash and collision avoidance; a skilled artisan would also know that such systems provide crash and collision severity mitigation, and occupant injury and death mitigation (including very dangerous and deadly vehicle rollover events) that also account for changes in vehicle dynamic forces, vehicle behavior, and road forces (*e.g.*, stopping, turning, cornering, changes in road surface, inclination, friction conditions, and weather), while decoupling and compensating any such measurements from the force of gravity or effect of grades or camber, without decreasing the sensitivity, and widening the calibration thresholds of these safety systems, which must perform within manufacturing, and vehicle tolerances, for all temperature and environmental conditions, without decreasing their all-around performance. As described in the '769 Patent, these inventive systems were not a conventional use of accelerometers, gyroscopes, and controllers in October 2004, which is demonstrated with reference to the art discussed in the specification. Nranian Decl., at ¶ 96.

94. That is even more apparent when the dependent claims are examined, each of which add specific limitations that further improve then-existing vehicle control and safety systems by providing better control over the suspension and by including a VCU that receives a signal from the accelerometer-gyroscope corresponding to a vertical acceleration to self-correct or issue a warning, and where the system can warn of low tire pressure or shock absorber degradation. *See* Section VI.A, *supra*. A skilled artisan would know that these systems were not previously known

in the art and certainly do not attempt to claim any law of nature. *Id.*; Nranian Decl., at ¶ 97.

95. At a minimum, a skilled artisan would know that the claims of the ’769 patent claim a combination of elements sufficient to ensure that the claims themselves, both in substance and in practice, are directed to concrete and inventive subject matter using technology in an unconventional way. For these reasons, the claims of the ’796 patent claim a combination of elements sufficient to ensure that the claims themselves, both in substance and in practice, are directed to concrete and inventive concepts (and not abstract ideas). Nranian Decl., at ¶ 98.

**INFRINGEMENT OF THE ’769 PATENT**

96. Based upon public information, Plaintiff is informed and believes that Defendant has infringed one or more claims of the ’769 patent, either literally or under the doctrine of equivalents, because it ships, distributes, makes, uses, imports, offers for sale, sells, and/or advertises its Tesla Adaptive Suspension Damping.

97. Based upon public information, Tesla Adaptive Suspension Damping meets each and every step of at least Claim 21 of the ’769 Patent, either literally or equivalently. Specifically, Defendant’s provision of Tesla Adaptive Suspension Damping has infringed, and continues to infringe, at least said claim because it provides a method for controlling the performance characteristics of a vehicle by sensing its lateral acceleration at the vehicle, sending a signal to a plurality of control devices based upon the vehicle’s lateral acceleration, and adjusting a suspension characteristic of the vehicle based upon the lateral acceleration of the vehicle. *See* **Exhibit A**.

98. Based upon public information, Defendant’s customers use Tesla Adaptive Suspension Damping in such a way that infringes one or more claims of the ’769 patent. *See* Exhibit A.

99. To the extent that Defendant is not the only direct infringer of one or more claims of

the '769 patent, it instructs its customers on how to use Tesla Adaptive Suspension Damping in ways that infringe said claims through its support and sales activities.[5]

100. Based upon public information, Defendant specifically intends its customers to use its products and services in such a way that infringes one or more claims of the '769 patent by, at a minimum, providing and supporting Tesla Adaptive Suspension Damping and instructing its customers on how to use it in an infringing manner, at least through information available on Defendant's website including information brochures, promotional material, and contact information. *See* Exhibit A.

101. Based upon public information, Defendant has intentionally induced, and continues to induce, infringement of one or more claims of the '769 patent in this District and elsewhere in the United States, by its intentional acts which have successfully, among other things, encouraged, instructed, enabled, and otherwise caused Defendant's customers, employees, partners, or contractors to use Tesla Adaptive Suspension Damping in an infringing manner. Defendant took active steps, directly or through contractual relationships with others, with the specific intent to cause them to use Tesla Adaptive Suspension Damping in a manner that infringes one or more claims of the '769 patent, including, for example, Claim 21. Such steps by Defendant included, among other things, advising or directing customers, personnel, contractors, or end-users to use Tesla Adaptive Suspension Damping in an infringing manner; advertising Tesla Adaptive Suspension Damping in an infringing manner. Defendant is performing these steps, which constitute induced infringement with the knowledge of the '769 patent and with the knowledge that the induced acts constitute infringement. Defendant is aware that the normal and customary use of the Accused Products by others would infringe one or more claims of the '769 patent.

[5] *See* FN 4.

Defendant's inducement is ongoing. *See* Exhibit A.

102. Defendant has also indirectly infringed and continues to indirectly infringe by contributing to the infringement of one or more claims of the '769 patent. Defendant has contributed, and continues to contribute, to the direct infringement of one or more claims of the '769 patent by its customers, personnel, and contractors. Tesla Adaptive Suspension Damping has special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the '769 patent, including, for example, Claim 21. The special features constitute a material part of the invention of one or more of the claims of the '769 patent and are not staple articles of commerce suitable for substantial non-infringing use. Defendant's contributory infringement is ongoing. *See* Exhibit A.

103. Despite knowledge of the '769 patent since as early as the date the original complaint was served, Defendant, based upon public information, continues to encourage, instruct, enable, and otherwise cause its customers to use its products and services, in a manner which infringes one or more claims of the '769 patent. Based upon public information, the provision of and sale of Tesla Adaptive Suspension Damping is a source of revenue and a business focus for Defendant.

104. Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

105. Furthermore, on information and belief, Defendant has a policy or practice of not reviewing the patents of others, including instructing its employees to not review the patents of others, and thus have been willfully blind of Vision Works' patent rights.

106. Defendant's actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendant.

107. Since at least the filing of the original complaint in this matter, Defendant's direct

and indirect infringement of the ’769 patent has been and continues to be willful, intentional, deliberate, or in conscious disregard of Plaintiff's rights under the patent.

108. Vision Works has been damaged and continues to be damaged as a result of the infringing conduct by Defendant alleged above. Thus, Defendant is liable to Vision Works in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

109. Vision Works has suffered and continues to suffer irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law. Vision Works has and will continue to suffer this harm by virtue of Defendant's infringement of one or more claims of the ’769 patent. Defendant's actions have interfered with and will interfere with Vision Works's ability to license technology. The balance of hardships favors Vision Works's ability to commercialize its own ideas and technology. The public interest in allowing Vision Works to enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

**COUNT II: INFRINGEMENT OF U.S. PATENT NO. 8,682,558**

110. Plaintiff re-alleges and incorporates by reference each of paragraphs 1-74 above as though fully set forth in their entirety.

111. U.S. Patent No. 8,682,558 (the "’558 patent") was issued on March 25, 2014 after full and fair examination by the USPTO of Application No. 13/650,017 which was filed on October 11, 2012. The ’558 patent is entitled "Absolute Acceleration Sensor For Use Within Moving Vehicles." *See* ’558 patent at p. 1.

112. Vision Works owns all substantial rights, interest, and title in and to the ’558 Patent, including the sole and exclusive right to prosecute this action and enforce it against infringers and to collect damages for all relevant times.

113. Vision Works or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the ’558 Patent.

114. The written description of the ’558 Patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

**SUBJECT MATTER ELIGIBILITY**

115. The claims of the ’558 Patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include inventive components that use measurements of the absolute acceleration of a vehicle to control at least one of its performance systems.

116. As noted in the beginning of this section, physical devices that employ sensors (*e.g.*, accelerometer sensors and/or gyroscopic sensors), a VCU, and one or more performance systems to better monitor and control a vehicle (and that can be adjusted in response to deceleration and/or changes in road conditions). In various forms, the devices, systems, and methods claimed in the ’558 patent identify absolute acceleration of the vehicle (*e.g.*, using accelerometer sensors and/or gyroscopic sensors) and can adjust the performance of the vehicle in response to those signals to improve safety and control over the vehicle. Nranian Decl., at ¶ 99.

117. The ’558 patent contains a total of 25 claims (three independent and twenty-two dependent), all directed to the foregoing devices, systems, and methods. For example, claims 1, 11, and 21 of the ’558 patent are recited below, and some of the more important elements of the claims are bolded and italicized for emphasis:

> **Claim 1:** A ***device*** for a vehicle comprising:
>
> ***an accelerometer-gyroscope***;
>
> a ***vehicle computer unit***; and
>
> an ***internal warning system***,
>
> wherein the ***accelerometer-gyroscope sends a signal to the vehicle computer unit*** and the vehicle computer unit ***operates one or more vehicle performance systems based upon the signal from the accelerometer-gyroscope***.
>
> **Claim 11:** A ***system*** for monitoring and controlling the performance characteristics of a vehicle comprising:
>
> an ***accelerometer-gyroscope*** for ***sensing an absolute acceleration*** of the vehicle;
>
> a ***vehicle computer unit*** that ***receives a signal from the accelerometer-gyroscope based upon the absolute acceleration of the vehicle***,
>
> wherein the ***vehicle computer unit operates one or more vehicle performance systems based upon the absolute acceleration*** of the vehicle.
>
> **Claim 21**: A ***method of monitoring and controlling the performance characteristics of a vehicle***, comprising:
>
> ***sensing an absolute acceleration*** of the vehicle at the vehicle;
>
> ***sending a signal to a vehicle computer unit based upon the absolute acceleration*** of the vehicle; and
>
> ***operating one or more vehicle performance systems based upon the absolute acceleration*** of the vehicle.

Nranian Decl., at ¶ 100.

Some examples of dependent claims of the '558 patent, which depend on independent claims 1, 11, and 21, include:

> **Claim 2.** The device of claim 1 wherein ***the accelerometer-gyroscope senses an absolute acceleration*** of the vehicle.

> **Claim 3.** The device of claim 2 wherein the ***accelerometer-gyroscope senses an absolute vertical acceleration*** of the vehicle.
>
> **Claim 4.** The device of claim 3 wherein the ***accelerometer-gyroscope sends a signal to a suspension monitoring portion of the vehicle computer unit***.
>
> **Claim 5.** The device of claim 1 wherein ***the vehicle computer unit performs a self-correct operation based upon the signal*** from the accelerometer-gyroscope.
>
> **Claim 6.** The device of claim 1 wherein the ***vehicle computer unit issues a warning through the warning system based upon the signal*** from the accelerometer-gyroscope.
>
> **Claim 7.** The device of claim 6 wherein ***the warning is a vehicle performance warning***.
>
> **Claim 8.** The device of claim 6 wherein ***the warning is a suspension performance warning***.
>
> **23.** The method of claim 21 wherein the ***vehicle computer unit receives a signal corresponding to the absolute acceleration*** of the vehicle and uses a baseline performance data ***to either self correct a performance characteristic of the vehicle or issue a warning***.
>
> **24.** The method of claim 23 wherein the vehicle computer unit issues an internal warning that ***a tire pressure is low***.
>
> **25.** The method of claim 23 wherein the vehicle computer unit issues an internal warning ***that one or more suspension shock absorbers of the vehicle are degraded***.

The remaining dependent claims add other features and/or are roughly identical to those presented above (*e.g.*, claims 12 and 22 are roughly the same as claim 3; claim 13 is the same as claim 4; claim 14 is the same as claim 5; claim 16 is the same as claim 6; claim 17 is the same as claim 7; claim 18 is the same as claim 8). Nranian Decl., at ¶ 101.

118. The foregoing claim elements are both concrete and specific in the physical system they claim, and each of the claims is patentably distinct from each other in what they claim (as highlighted above). Independent claims 1, 11, and 21 are directed to, among other things, a system

to solve problems in vehicle control and safety systems in October of 2004 (*e.g.*, the inability to account for gravity, grades, or camber without impacting the sensitivity of safety systems like collision warning or anti-rollover systems, which prior systems could not accomplish). Nranian Decl., at ¶ 102.

119. None of the claims of the '558 patent (or any other Vehicle Control and Safety System Patent) are representative of any other. For instance, claim 1 is directed to, among other things, a physical device that uses an accelerometer-gyroscope for sending a signal to a VCU that operates one or more vehicle performance systems based on the signal. The claims depending to claim 1 further claim more specific version of the invention that include, for instance, a system where the accelerometer-gyroscope senses an absolute acceleration of the vehicle (claim 2), where the accelerometer-gyroscope senses an absolute vertical acceleration of the vehicle (claim 3), where the accelerometer-gyroscope sends a signal to a suspension monitoring portion of the VCU (claim 4), where the VCU issues a warning to the warning system based on the accelerometer-gyroscope signal (claim 6) and where the warning is a vehicle performance warning (claim 7) and a suspension performance warning (claim 8). Nranian Decl., at ¶ 103.

120. Independent claim 11 claims a system for monitoring and controlling performance characteristics through an accelerometer-gyroscope for sensing an absolute acceleration of the vehicle coupled with a VCU that can receive a signal based on the absolute acceleration and operate one or more vehicle performance systems based on the absolute acceleration of the vehicle. The dependent claims 12 to 20 claim more specific forms of the inventions. Many of the claims depending from 11 are similar to the dependents to independent claim 1 (*e.g.*, claims 12 is roughly the same as claim 3; claim 13 is the same as claim 4; claim 14 is the same as claim 5; claim 16 is the same as claim 6; claim 17 is the same as claim 7; claim 18 is the same as claim 8). Nranian

Decl., at ¶ 104.

121. Independent claim 21 claims a method of monitoring and controlling the performance characteristics of a vehicle by sensing an absolute acceleration of the vehicle at the vehicle, sending a signal to VCU based upon the lateral acceleration, and adjusting one or more vehicle performance systems based upon the absolute acceleration of the vehicle. The dependent claims 22 to 25 claim more specific inventions. For example, some of the claims depending on claim 21 include all of the same additional limitations present in those claims dependent to claim 11 (*e.g.*, claim 22 is roughly the same as claim 3), but others include additional limitations, including where the system further includes a VCU that receives a signal corresponding to an absolute acceleration in order to self-correct a performance characteristic or issue a warning (claim 23), and where the warning can indicate a low tire pressure (claim 24) or suspension shock absorber degradation (claim 25). Nranian Decl., at ¶ 105.

122. All of these claims are directed to solving the technical problems that existed with vehicle control and safety systems in October of 2004. They do so, among other ways, by sensing absolute acceleration of the vehicle using, for instance, accelerometer sensors and gyroscopic sensors in combination to control vehicle performance systems based on the absolute acceleration, which allows the systems to, among other things, decouple and compensate any such measurements from the force of gravity, or effect of grades or camber, and without decreasing the sensitivity or thresholds for detecting safety concerns. The other dependent claims add specific limitations that further improve then-existing vehicle control and safety systems by, for example, providing better control over the vehicle's performance systems, by including a VCU that receives absolute acceleration signals from the accelerometer sensors and gyroscopic sensors, and by providing for the generation and receiving of (absolute) vertical acceleration; the other dependent

claims further provide systems to self-correct or issue a warning, including where the system can warn of low tire pressure or shock absorber degradation. Nranian Decl., at ¶ 106.

123. The claims of the ’558 patent are not directed to a law of nature, abstract mathematical relationships, or any other abstract idea. More specifically, the claims of the ’558 patent do not patent absolute acceleration, natural laws of engine dynamics, or any mathematical relationship between throttle and corresponding vehicle acceleration and speed. While it is true that the devices, systems, and methods claimed by the ’558 patent measure absolute acceleration to control the vehicle’s performance, it does not attempt to patent any law of nature or abstract idea, and in fact, it does not even attempt to claim any well-understood, routine, or conventional activity. Nranian Decl., at ¶ 107.

124. The claims of the ’558 patent provide novel devices, systems, and methods for monitoring and controlling vehicles to increase performance and safety by employing absolute acceleration (in addition to, for instance, acceleration and deceleration) as well as gyroscope inputs, to adjust a vehicle’s performance systems (in various ways), and/or warn about potential failures/degradation of crucial vehicle components, and, in doing so, provide mitigation of potential vehicle accidents. The use of systems to sense accelerations (and decelerations) also includes real-time inputs from gyroscopic sensors for compensation (accounting for normal and potentially dangerous vehicle forces) to adjust the vehicle’s systems by using controllers that receive signals based on these combined sensors as inputs to provide, for example, notification of potential component degradation/failure, and benefits related to crash and collision severity mitigation, along with occupant injury and death mitigation (including for example, very dangerous and deadly vehicle rollover events and other types of accidents). By providing warnings and compensation for critical vehicle safety components, mitigation of accidents caused

by vehicular and road forces occurs (*e.g.*, stopping, turning, cornering, changes in road surface, inclination, friction conditions, and weather), while decoupling and compensating any such measurements from the force of gravity or effect of grades or camber, without decreasing the sensitivity and widening the calibration thresholds of these safety systems, which must perform within manufacturing and vehicle tolerances, for all temperature and environmental conditions, and without decreasing the all-around performance of these safety systems. As described in the '558 Patent, these inventive systems were not a conventional use of accelerometers, gyroscopes, and controllers in October of 2004, which is demonstrated with reference to the art discussed in the specification. The claimed inventions do so by employing inventive components that account for the force of gravity, effect of grades, and the impact of camber on acceleration measurements without decreasing the sensitivity of vehicle safety systems. A person skilled in the art would understand that these patents and the challenged claims provided a specific improvement in technical capabilities that did not exist prior to the priority date of the '558 patent, and more specifically, allowed critical vehicle control and safety systems to operate in a more sensitive and accurate manner, which was an improvement in the art. In other words, the device, system, and methods claimed in the '558 patent solve known technical problems in the vehicle control and safety systems in unique and inventive ways previously not known in the art. *See supra*; Nranian Decl., at ¶ 108.

125. The claims of the '558 patent do not preempt all ways of accounting for the force of gravity, effect of grades, and the impact of camber on acceleration measurements in vehicle control and safety systems, much less all ways of improving safety in vehicle monitoring and control systems by using warning systems and a VCU to control performance in response to acceleration signals. There is a myriad of other ways such systems could be architected, including by practicing

the systems of Bloomfield or detecting changes in vehicle acceleration using Hamlin Reed sensors. Indeed, any of the devices disclosed in the almost 100 prior art references on the face of the patent could be practiced without infringing on the claims of the ’558 patent. Nranian Decl., at ¶ 109.

126. The ’558 Patent and its claims cannot be performed mentally by a person and cannot be carried out with a piece of paper and a pencil. For example, people of skill in the art have never witnessed a person telepathically monitoring, compensating, and otherwise controlling adjustable suspension components in real time while driving around a corner at high rates of speed. A person of skill in the art has witnessed worn and degraded suspension components, and specifically, under-inflated tires and tire failure (*e.g.*, the numerous Ford/Firestone roll-over accidents that lead to requiring for tire pressure monitoring systems (TPMS)), and other critical safety system components causing roll-overs, rear-end collisions side impacts, and other deadly crashes and accidents. The ’558 Patent mitigates these deadly and severe problems as known in the prior art and do so through tangible components and systems. A person of skill in the art has witnessed and forensically investigated numerous roll-over and other vehicle accident events, including forward, angled and rear impact events. Many of these events have involved death and serious injury. Many of these collisions and crashes were due to worn and degraded components that went unnoticed by drivers and vehicle owners and degraded or failed without warning. The monitoring, warning, and compensating systems and methods described and claimed in the ’558 Patent would mitigate the number and effects of these events. Also, a person of skill in the art has witnessed and forensically evaluated numerous deadly vehicle roll-over events due to the inability to control vehicles while steering and maneuvering around turns and corners. These cause instantaneous changes to the vehicle’s dynamics and alter how mass is distributed relative to the active rotation axis during the maneuver; these also alter the vehicle’s effective resistance to rotation due to weight transfer,

suspension motion, and other factors that in many real-world situations are caused by failed components (such as tires, other suspension components and/or critical vehicle components). Proper monitoring, compensation, and perception of these situations are beyond human mental, perceptive, and reactive capabilities, thus causing accidents and crashes. Through proper warning and automatic compensation of vehicle components through inputs from sensors, accelerometers, and gyroscopes that warn, compensate, and control critical vehicle safety components, the number of deadly and severe accidents will be mitigated. The ’558 Patent mitigates these deadly and severe problems as known in the prior art and do so through tangible vehicle components and systems. These are not abstract concepts. These are not mental concepts readily performed in the human mind. Nranian Decl., at ¶ 110.

127. Even if the ’558 patent claims were directed at a law of nature, some mathematical relationship, or any other abstract idea (and they are not), the claims capture subject matter that is inventive. The claims of the ’558 patent are directed to matter that was not known in the art at the time and, to the extent that the claims employ components and technology that existed at the time (*e.g.*, accelerometers, gyroscopes, and VCUs), they are employed together here in a way that was new (non-conventional, non-routine, and non-generic to those skilled in the art). These claims are directed to specific solutions using technology in an inventive way to improve vehicle safety by controlling performance characteristics of a vehicle in response to absolute acceleration data (thereby controlling for the force of gravity, effect of grades, and the impact of camber without decreasing system sensitivity), which was not previously known in the art. In fact, a skilled artisan would know that the use of systems to sense lateral acceleration also includes real-time inputs from gyroscopic sensors for compensation (that account for normal and potentially dangerous vehicle forces) that adjust vehicle systems using controllers that receive signals based on these combined

sensors as inputs in order to provide effective warnings, compensation, and control of safety critical vehicle components and systems to reduce deadly and serious accidents, and provide crash and collision severity mitigation, and occupant injury and death mitigation (including very dangerous and deadly vehicle rollover events, and other accidents). The ’558 Patent monitor, detect, warn and/or compensate for degraded and/or the failure of safety critical vehicle components, which can instantaneously fail or improperly perform in normal and/or abnormal vehicle driving events (such as stopping, turning, cornering, changes in road surface, inclination, friction conditions, and weather, etc.). As described in the ’558 Patent, these inventive systems were not a conventional use of accelerometers, gyroscopes, and controllers in October of 2004, which is demonstrated with reference to the art discussed in the specification (*e.g.*, Bloomfield). Nranian Decl., at ¶ 111.

128. In fact, a skilled artisan would know that the use of systems to sense absolute acceleration of the vehicle using, for instance, accelerometer sensors and gyroscopic sensors, to adjust the performance characteristics by operating one or more performance systems of the vehicle based on the absolute acceleration as well as the inputs from these sensors (*e.g.*, accelerometers, gyroscopes) to provide effective monitoring, warnings, and compensation was not a conventional use of accelerometers, gyroscopes, and VCUs at the time of invention, which is demonstrated with reference to the art discussed in the specification (*e.g.*, Bloomfield). Nranian Decl., at ¶ 112.

129. That is even more apparent when the dependent claims are examined. A skilled artisan would know that the dependent claims add specific limitations that further improve then-existing vehicle control and safety systems by providing better control over the vehicle’s performance systems and characteristics through a VCU that receives absolute acceleration

corresponding to a vertical acceleration to self-correct or issue a warning, including low tire pressure or shock absorber degradation warning. *See supra*. A skilled artisan would have known that these systems were not previously known in the art and certainly do not attempt to claim any law of nature. *Id.* At a minimum, a skilled artisan would understand that the claims of the '558 patent claim a combination of elements sufficient to ensure that the claims themselves, both in substance and in practice, are directed to concrete and inventive subject matter using technology in an unconventional way. For these reasons, the claims are directed to subject matter that was far from conventional or routine. Indeed, they were unknown in the art. Nranian Decl., at ¶ 113.

**INFRINGEMENT OF THE '558 PATENT**

130. Based upon public information, Plaintiff is informed and believes that Defendant has infringed one or more claims of the '558 Patent, either literally or under the doctrine of equivalents, because it ships, distributes, makes, uses, imports, offers for sale, sells, and/or advertises its Tesla Adaptive Suspension Damping.

131. Based upon public information, Tesla Adaptive Suspension Damping meets each and every step of at least Claim 21 of the '558 patent, either literally or equivalently. Specifically, Defendant's provision of Tesla Adaptive Suspension Damping has infringed, and continues to infringe, at least said claim because it provides a method for monitoring and controlling the performance characteristics of a vehicle including an accelerometer-gyroscope for sensing an absolute acceleration of the vehicle, a vehicle computer unit that receives a signal from the accelerometer-gyroscope based upon the absolute acceleration of the vehicle and operates one or more vehicle performance systems based upon the absolute acceleration of the vehicle. *See* **Exhibit B.**

132. Based upon public information, Defendant's customers use Tesla Adaptive Suspension Damping in such a way that infringes one or more claims of the '558 patent. *See*

Exhibit B.

133. To the extent that Defendant is not the only direct infringer of one or more claims of the ’558 patent, it instructs its customers on how to use Tesla Adaptive Suspension Damping in ways that infringe said claims through its support and sales activities.[6]

134. Based upon public information, Defendant specifically intends its customers to use its products and services in such a way that infringes one or more claims of the ’558 patent by, at a minimum, providing and supporting Tesla Adaptive Suspension Damping and instructing its customers on how to use it in an infringing manner, at least through information available on Defendant’s website including information brochures, promotional material, and contact information. *See* Exhibit B.

135. Based upon public information, Defendant has intentionally induced, and continues to induce, infringement of one or more claims of the ’558 patent in this District and elsewhere in the United States, by its intentional acts which have successfully, among other things, encouraged, instructed, enabled, and otherwise caused Defendant’s customers, employees, partners, or contractors to use Tesla Adaptive Suspension Damping in an infringing manner. Defendant took active steps, directly or through contractual relationships with others, with the specific intent to cause them to use Tesla Adaptive Suspension Damping in a manner that infringes one or more claims of the ’558 patent, including, for example, Claim 21. Such steps by Defendant included, among other things, advising or directing customers, personnel, contractors, or end-users to use Tesla Adaptive Suspension Damping in an infringing manner; advertising and promoting the use of F Tesla Adaptive Suspension Damping in an infringing manner; or distributing instructions that guide users to use Tesla Adaptive Suspension Damping in an infringing manner. Defendant is

[6] *See* FN 4.

performing these steps, which constitute induced infringement with the knowledge of the ’558 patent and with the knowledge that the induced acts constitute infringement. Defendant is aware that the normal and customary use of the Accused Products by others would infringe one or more claims of the ’558 patent. Defendant’s inducement is ongoing. *See* Exhibit B**.**

136. Defendant has also indirectly infringed and continues to indirectly infringe by contributing to the infringement of one or more claims of the ’558 patent. Defendant has contributed and continues to contribute to the direct infringement of one or more claims of the ’558 patent by its customers, personnel, and contractors. Tesla Adaptive Suspension Damping has special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the ’558 patent, including, for example, Claim 21. The special features constitute a material part of the invention of one or more of the claims of the ’558 patent and are not staple articles of commerce suitable for substantial non-infringing use. Defendant’s contributory infringement is ongoing. *See* Exhibit B**.**

137. Despite knowledge of the ’558 patent since as early as the date the original complaint was served, Defendant, based upon public information, continues to encourage, instruct, enable, and otherwise cause its customers to use its products and services, in a manner which infringes one or more claims of the ’558 patent. Based upon public information, the provision of and sale of Tesla Adaptive Suspension Damping is a source of revenue and a business focus for Defendant.

138. Defendant’s aforesaid activities have been without authority and/or license from Plaintiff.

139. Furthermore, on information and belief, Defendant has a policy or practice of not reviewing the patents of others, including instructing its employees to not review the patents of others, and thus have been willfully blind of Vision Works’ patent rights.

140. Defendant's actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendant.

141. Since at least the filing of the original complaint in this matter, Defendant's direct and indirect infringement of the '558 patent has been and continues to be willful, intentional, deliberate, or in conscious disregard of Plaintiff's rights under the patent.

142. Vision Works has been damaged and continues to be damaged as a result of the infringing conduct by Defendant alleged above. Thus, Defendant is liable to Vision Works in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

143. Vision Works has suffered and continues to suffer irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law. Vision Works has and will continue to suffer this harm by virtue of Defendant's infringement of one or more claims of the '558 patent. Defendant's actions have interfered with and will interfere with Vision Works's ability to license technology. The balance of hardships favors Vision Works's ability to commercialize its own ideas and technology. The public interest in allowing Vision Works to enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

**COUNT III: INFRINGEMENT OF U.S. PATENT NO. 9,830,821**

144. Plaintiff re-alleges and incorporates by reference each of paragraphs 1-74 above as though fully set forth in their entirety.

145. U.S. Patent No. 9,830,821 (the "'821 patent") was issued on November 28, 2017 after full and fair examination by the USPTO of Application No. 14/584,946 which was filed on December 29, 2014. The '821 patent is entitled "Absolute Acceleration Sensor For Use Within Moving Vehicles." *See* '821 patent at p. 1.

146. Vision Works owns all substantial rights, interest, and title in and to the ’821 Patent, including the sole and exclusive right to prosecute this action and enforce it against infringers and to collect damages for all relevant times.

147. Vision Works or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the ’821 Patent.

148. The written description of the ’821 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

**SUBJECT MATTER ELIGIBILITY**

149. The claims of the ’821 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include inventive components that improve vehicle safety by providing a system for communicating information about the speed of a vehicle and about its distance to a nearby vehicle.

150. The relevant ’821 patent claims are directed to physical devices that employ pointable range finders, recorders and control devices coupled to the range finder and recorder to calculate the distance of vehicles from objects, record the vehicle’s operation status if the vehicle enters a safe-zone threshold with respect to the objects that is dynamic, i.e., increases as the vehicle speed increases once the vehicle reaches a predetermined speed. The invention improves the prior art by using a speed-adaptive safe-zone threshold that automatically increases with vehicle speed and records unsafe following distance events, including to a database in addition to providing real-time warnings. Nranian Decl., at ¶ 114.

151. Specifically, the ’821 patent contains a total of 25 claims (three independent and twenty-two dependent), all directed to the foregoing devices, systems, and methods. For example, claims 1, 12, and 19 of the ’821 patent are recited below, and some of the more important elements of the claims are bolded and italicized for emphasis:

> **Claim 1.** A ***communication system for a moving vehicle*** comprising:
>
> > a ***pointable range finder to calculate a distance between the vehicle and an object***;
> >
> > a ***recorder for recording an operation status of the vehicle***; and
> >
> > a ***control device*** coupled to the range finder and the recorder, wherein the range finder sends a signal to the control device corresponding to a distance of the vehicle from the object and ***the control device operates the recorder in a manner dependent upon the signal from the range finder wherein the control device sends a signal to the recorder to record the operation status of the vehicle if the vehicle enters a safe-zone threshold with respect to the object***, and wherein ***the safe-zone threshold depends on a speed of the vehicle***, and further wherein the ***safe-zone threshold increases as the speed of the vehicle increases*** once the vehicle reaches a determined speed.
>
> **Claim 12.** A ***communication method for a moving vehicle*** comprising:
>
> ***calculating a distance of the vehicle from an object***; and
>
> ***recording the event if the vehicle enters a safe-zone threshold with respect to the object***, wherein the ***safe zone threshold depends on a traveling speed of the vehicle***, and further wherein the ***safe-zone threshold increases as the speed of the vehicle increases*** once the vehicle reaches a determined speed.
>
> **Claim 19**. A ***communication system for a vehicle*** comprising:
>
> ***a system*** located within a vehicle ***to calculate and record an unsafe distance encroachment event by the vehicle into a safe-zone threshold with respect to an object***, wherein the ***safe-zone threshold depends on a traveling speed of the vehicle***, and further wherein the ***safe-zone threshold increases as the speed of the vehicle increases*** once the vehicle reaches a determined speed; and

> ***a database for saving the encroachment event***, wherein the database is not located within the vehicle.

’821 patent at claims 1, 12, and 19 (emphasis added). I have also recited some examples of dependent claims to independent claims 1, 12, and 19, which provide:

> **Claim 7.** The communication system of claim 1, wherein the ***range finder is actively pointable***.
>
> **Claim 8.** The communication system of claim 1, wherein the ***rangefinder is pointable in the direction of the object as the vehicle is making a turn***.
>
> **Claim 9.** The communication system of claim 8, wherein the ***rangefinder receives data from an accelerometer to determine the direction and degree of turn***.
>
> **Claim 10.** The communication system of claim 1, further comprising a ***speed control system coupled to the control device, wherein the control device operates the speed control system*** in a manner dependent upon the distance between the vehicle and the object.14. The com
>
> **Claim 14.** The communication method of claim 13, wherein a plurality of different recorded events recorded at different times are saved.
>
> **Claim 15.** The communication method of claim 14, wherein the saved event is retrievable.
>
> **Claim 18.** The communication method of claim 12, further comprising ***adjusting the speed of the vehicle based upon the distance of the vehicle from the object***.
>
> **Claim 21.** The communication system of claim 19, wherein ***the encroachment event is automatically saved within the database***.
>
> **Claim 22.** The communication system of claim 21, wherein ***the encroachment event is automatically saved when the vehicle returns to its starting point***.
>
> **Claim 25**. The communication system of claim 19, wherein the ***system records a GPS location of the vehicle with the encroachment event***.

’821 patent at claims 7-10, 18, 21-22, and 25 (emphasis added); Nranian Decl., at ¶ 115.

152. The foregoing claim elements are both concrete and specific in the physical system they claim, and each of the claims is patentably distinct from each other in what they claim (as highlighted above). Nranian Decl., at ¶ 116.

153. Independent claims 1, 9, and 21 are directed to, among other things, communication devices and methods to solve problems in vehicle control and safety systems at the relevant priority dates discussed above, by using pointable range finders, recorders, and control devices coupled to the range finder and recorder to calculate the distance of vehicles from objects, record the vehicle's operation status if the vehicle enters a dynamic safe-zone threshold with respect to the objects, which the prior systems discussed in the specification could not accomplish. Nranian Decl., at ¶ 117.

154. According to a person of skill in the art, these claims are directed to more than any abstract idea. The claims are concrete and specific in the subject matter they claim, which solve the technical problems existing at the relevant priority dates. Claim 1 is directed to a physical device comprising a pointable range finder to calculate a distance between the vehicle and an object; a recorder for recording an operation status of the vehicle; and a control device coupled to the range finder and recorder, where the range finder sends a signal to the control device corresponding to a distance between a vehicle and an object, and the recorder signals the recorder to record the operation status based upon whether a vehicle enters a safe-zone threshold. The dependent claims to this claim are directed to more specific devices, including those that include an accelerometer (claim 9), and a speed control system coupled to the control device (claim 10). Importantly, each of the elements of claims 1, 9, and 10, among others, are directed to the very specific structures identified above. Each of these additional limitations provides supplemental solutions to then-existing technical problems with vehicle control and safety systems. A person

of skill in the art would understand that each of the highlighted claims above provided a specific improvement in the existing computer systems that did not exist prior to the priority date of the ’821 patent, and, more specifically, provide for specific devices and methods that determine whether a driver is following another vehicle too closely (dependent upon the speed) and can monitor driver safety over time using a speed-adaptive safe-zone threshold that automatically increases with vehicle speed and records unsafe following distance events, including to a database, in addition to providing real-time warnings. Nranian Decl., at ¶ 118.

155. Additionally, none of these claims are directed to subject matter that can be performed by a human, mentally or with pen and paper. The claims require physical range finder hardware to measure distances to moving vehicles in real-time, which cannot be done mentally or by human observation. The system must continuously and simultaneously measure speed, calculate speed-dependent safety thresholds, compare actual distances, and trigger recordings - all happening multiple times per second, which is computationally impossible for humans to perform while driving. The automated integration of sensors, real-time calculations, and automatic recording without human intervention represents a technological solution that fundamentally cannot be replicated through mental steps or pen-and-paper calculations. Nranian Decl., at ¶ 119.

156. The ’821 Patent and its claims cannot be performed mentally by a person and cannot be carried out with a piece of paper and a pencil. For example, a person of skill in the art has witnessed rear-end collisions because of distracted driving and failure to brake in a timely manner due to the driver’s inability to perceive and react in time. The ’821 Patent mitigates these deadly and severe problems as known in the prior art and do so through tangible components and systems. A person of skill in the art has witnessed and forensically investigated numerous front, side, and rear impact events, as well as forward and angled accidents involving vehicles turning at

intersections. Many of these events have involved death and serious injury. For example, a case in which a six-year-old boy was rendered a quadriplegic based on the driver of the at-fault vehicle's failure to recognize the right of way of on-coming vehicle and improperly made a left turn into oncoming traffic, and numerous other such collisions and crashes were due to driver error, driver distraction, falling asleep at the wheel, sunlight and glare blinding, and lack of driver perception and reaction. The collision warning, rear end collision, and crash avoidance systems, as described and claimed in the '821 Patent, mitigate the number and effects of these events. Also, a person of skill in the art has witnessed and forensically evaluated numerous deadly vehicle accidents due to the inability to recognize other vehicles and objects driving and maneuvering turns and corners. Through proper warnings and automatic control of vehicle systems to stop or lessen the severity of these events, the '821 Patent mitigates these deadly and severe problems as known in the prior art and do so through tangible vehicle components and systems. Also, by automatically and/or timely recording these types of events (including encroachment and tailgating), driver behavior and safety risk can be properly evaluated and improved upon; additionally, efforts leading to future safety and crash avoidance systems can be prioritized and developed that target and identify real-world problems. Warning and controlling vehicle components (through inputs from sensors, accelerometers, and gyroscopes that control braking and warn about vehicles and objects ahead) will mitigate the number and severity of rear-end collisions, which make up 30 to 40 percent of accidents and are typically caused by the driver's inability to perceive, timely react, or distracted driving. Based on what is described and claimed in the '821 Patent, the number of injuries, deaths, and injury severity of these events will be mitigated. The systems and methods described and claimed in the '821 Patent are not abstract concepts. These are not mental concepts readily performed in the human mind, but rather provide solutions concrete, tangible, solutions to deadly

and serious vehicle collision events that also serve to mitigate death and serious injury. Nranian Decl., at ¶ 120.

157. Additionally, the claims of the ’821 patent do not preempt all the ways of detecting and warning when a vehicle may be getting to close to another vehicle or otherwise entering a unsafe zone of driving. There are many other ways that such problems could be managed. For instance, the claims do not cover systems without speed-adaptive thresholds. Notably, the systems that were disclosed in the more than one hundred prior art patents and publications identified on the face of the patent would also not be preempted. Nranian Decl., at ¶ 121.

158. Even if the ’821 patent claims were directed at an abstract idea (and they are not), the claims capture subject matter that is inventive. To the extent that the claims employ components and technology that existed at the time (*e.g.*, rangefinders, recorders, control devices, and accelerometers) they are employed together here in a way that was new and would not have been considered conventional, routine, or generic to those skilled in the art. The ’821 patent’s provision of communication systems and methods for monitoring and recording encroachments of a speed-adaptive safe-zone threshold in real time (that can be recorded in a database) using a system with specific, concrete components, such as a range finder, recorder, control device, accelerometer, and speed control system within the vehicle, is inventive and was not merely the conventional use of technology that was already well-known in the industry. Nranian Decl., at ¶ 122.

159. Even if that were not true, the ordered combination of limitations in claims 1, 12, and 19 of the ’821 patent, as recited and described in detail above, were not known in the art, much less well-known. A person of skill in the art was not aware of any art or system that existed at the time and that disclosed all of the limitations of these claims in a way that solved the then-existing

problems of monitoring and recording encroachments of a speed-adaptive safe-zone threshold in real time. These claims are directed to specific solutions using technology in an inventive and unique way (described above) to solve the problems then-known in the art. Nranian Decl., at ¶ 123.

160. For the reasons stated above, the claims of the ’821 patent claim a combination of elements sufficient to ensure that the claims themselves, both in substance and in practice, are directed to concrete and inventive concepts (and not abstract ideas). Nranian Decl., at ¶ 124.

## INFRINGEMENT OF THE ’821 PATENT

161. Based upon public information, Plaintiff is informed and believes that Defendant has infringed one or more claims of the ’821 Patent, either literally or under the doctrine of equivalents, because it ships, distributes, makes, uses, imports, offers for sale, sells, and/or advertises its Tesla Autopilot.

162. Based upon public information, Tesla Autopilot meets each and every step of at least Claim 12 of the ’821 patent, either literally or equivalently. Specifically, Defendant’s provision of Tesla Autopilot has infringed, and continues to infringe at least said claim because Tesla Autopilot provides a method for communication for a vehicle to calculate a distance between the vehicle and an object and for recording the event if the vehicle enters a safe-zone threshold with respect to distance between the vehicle and the object, wherein the safe-zone threshold is set based upon the speed of the vehicle, and which increases as the speed of the vehicle increases once the vehicle reaches a specified speed. *See* **Exhibit C.**

163. Based upon public information, Defendant’s customers use Tesla Autopilot in such a way that infringes one or more claims of the ’821 patent. *See* Exhibit C.

164. To the extent that Defendant is not the only direct infringer of one or more claims of the ’821 patent, it instructs its customers on how to use Tesla Autopilot in ways that infringe said

claims through its support and sales activities.[7]

165. Based upon public information, Defendant specifically intends its customers to use its products and services in such a way that infringes one or more claims of the ’821 patent by, at a minimum, providing and supporting Tesla Autopilot and instructing its customers on how to use it in an infringing manner, at least through information available on Defendant’s website including information brochures, promotional material, and contact information. *See* Exhibit C.

166. Based upon public information, Defendant has intentionally induced, and continues to induce, infringement of one or more claims of the ’821 patent in this District and elsewhere in the United States, by its intentional acts which have successfully, among other things, encouraged, instructed, enabled, and otherwise caused Defendant’s customers, employees, partners, or contractors to use Tesla Autopilot in an infringing manner. Defendant took active steps, directly or through contractual relationships with others, with the specific intent to cause them to use Tesla Autopilot in a manner that infringes one or more claims of the ’821 patent, including, for example, Claim 12. Such steps by Defendant included, among other things, advising or directing customers, personnel, contractors, or end-users to use Tesla Autopilot in an infringing manner; advertising and promoting the use of Tesla Autopilot in an infringing manner; or distributing instructions that guide users to use Tesla Autopilot in an infringing manner. Defendant is performing these steps, which constitute induced infringement with the knowledge of the ’821 patent and with the knowledge that the induced acts constitute infringement. Defendant is aware that the normal and customary use of the Accused Products by others would infringe one or more claims of the ’821 patent. Defendant’s inducement is ongoing. *See* Exhibit C.

167. Defendant has also indirectly infringed and continues to indirectly infringe by

---

[7] *See* FN 4.

contributing to the infringement of one or more claims of the ’821 patent. Defendant has contributed and continues to contribute to the direct infringement of one or more claims of the ’821 patent by its customers, personnel, and contractors. Tesla Autopilot has special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the ’821 patent, including, for example, Claim 12. The special features constitute a material part of the invention of one or more of the claims of the ’821 patent and are not staple articles of commerce suitable for substantial non-infringing use. Defendant’s contributory infringement is ongoing. *See* Exhibit C.

168. Despite knowledge of the ’821 patent since as early as the date the original complaint was served, Defendant, based upon public information, continues to encourage, instruct, enable, and otherwise cause its customers to use its products and services, in a manner which infringes one or more claims of the ’821 patent. Based upon public information, the provision of and sale of Tesla Autopilot is a source of revenue and a business focus for Defendant.

169. Defendant’s aforesaid activities have been without authority and/or license from Plaintiff.

170. Furthermore, on information and belief, Defendant has a policy or practice of not reviewing the patents of others, including instructing its employees to not review the patents of others, and thus have been willfully blind of Vision Works’ patent rights.

171. Defendant’s actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendant.

172. Since at least the filing of the original complaint in this matter, Defendant’s direct and indirect infringement of the ’821 patent has been and continues to be willful, intentional, deliberate, or in conscious disregard of Plaintiff’s rights under the patent.

173. Vision Works has been damaged and continues to be damaged as a result of the infringing conduct by Defendant alleged above. Thus, Defendant is liable to Vision Works in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

174. Vision Works has suffered and continues to suffer irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law. Vision Works has and will continue to suffer this harm by virtue of Defendant's infringement of one or more claims of the '821 patent. Defendant's actions have interfered with and will interfere with Vision Works's ability to license technology. The balance of hardships favors Vision Works's ability to commercialize its own ideas and technology. The public interest in allowing Vision Works to enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

## COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 10,391,989

175. Plaintiff re-alleges and incorporates by reference each of paragraphs 1-74 above as though fully set forth in their entirety.

176. U.S. Patent No. 10,391,989 (the "'989 patent") was issued on August 27, 2019 after full and fair examination by the USPTO of Application No. 15/791,133 which was filed on October 23, 2017. The '989 patent is entitled "Absolute Acceleration Sensor For Use Within Moving Vehicles." *See* '989 patent at p. 1.

177. Vision Works owns all substantial rights, interest, and title in and to the '989 patent, including the sole and exclusive right to prosecute this action and enforce it against infringers and to collect damages for all relevant times.

178. Vision Works or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the

’989 patent.

179. The written description of the ’989 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

## SUBJECT MATTER ELIGIBILITY

180. The claims of the ’989 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include inventive components for detecting levels of lateral acceleration of moving vehicles and generating responses to changes in these levels to maintain stability under varying driving and road conditions.

181. The relevant ’989 patent claims are directed to physical vehicle monitoring systems that employ accelerometers, circuits, control devices, and electronic signals (among other components) to send a signal to a speed reduction activation circuit to reduce a speed of the vehicle based on a heading of the vehicles and if the lateral acceleration is greater than a threshold value (such as by controlling the engine, drive wheel, and braking). In disclosing and claiming these innovations, the claims improve vehicle control and safety systems by detecting and responding to lateral acceleration to prevent rollover accidents and improving vehicle stability by slowing down the vehicle when it reaches unsafe lateral acceleration thresholds in light of the vehicle’s heading. Nranian Decl., at ¶ 136.

182. The ’989 patent contains a total of 27 claims (three independent and twenty-four dependent), all directed to the foregoing devices, systems, and methods. For example, claims 1, 9, and 20 of the ’989 patent are recited below, and some of the more important elements of the

claims are bolded and italicized for emphasis:

> **Claim 1.** A ***vehicle monitoring system*** comprising:
>
> ***an accelerometer for detecting a lateral acceleration of the vehicle***;
>
> ***a speed reduction activation circuit***; and
>
> ***a control device, wherein the control device receives a signal from the accelerometer and sends a signal to the speed reduction activation circuit based upon the signal from the accelerometer***, wherein the control device sends a signal to the speed reduction activation circuit ***to reduce a speed of the vehicle based on a heading of the vehicle and if the lateral acceleration is greater than a threshold value***.
>
> **Claim 9.** A ***method of monitoring a vehicle*** comprising:
>
> ***detecting a lateral acceleration of the vehicle***;
>
> ***determining whether the lateral acceleration of the vehicle is greater than a threshold value***; and
>
> based on a heading of the vehicle and ***if the lateral acceleration is greater than the threshold value, reducing the speed of the vehicle***.
>
> **Claim 20**. A ***vehicle monitoring system*** comprising:
>
> ***an accelerometer for detecting a gross lateral acceleration of the vehicle***;
>
> ***a speed reduction activation circuit***; and
>
> ***a control device, wherein the control device receives a signal form the accelerometer based on the gross lateral acceleration of the vehicle***, ***wherein the control device calculates the absolute lateral acceleration based upon the gross acceleration value and sends a signal to the speed reduction activation circuit based upon the gross acceleration value***, wherein the control device sends a signal to the speed reduction activation circuit ***to reduce a speed of the vehicle based on a heading of the vehicle and if the gross lateral acceleration is greater than a threshold value***.

’989 patent, claims 1, 9, and 20 (emphasis added). I have also recited some examples of dependent claims to independent claims 1 and 9, which provide:

> **Claim 2.** The vehicle monitoring system of claim 1, wherein the ***control device sends a signal to the speed reduction circuit which slows a propulsion of the engine***.
>
> **Claim 3.** The vehicle monitoring system of claim 1, wherein the ***control device sends a signal to the speed reduction circuit which slows a drive wheel of the vehicle***.
>
> **Claim 4.** The vehicle monitoring system of claim 1, wherein the ***control device sends a signal to the speed reduction circuit which activates a braking system of the vehicle***.
>
> **Claim 5.** The vehicle monitoring system of claim 4, wherein the ***braking system is activated based upon the heading of the vehicle and the direction of lateral acceleration***.
>
> **Claim 6.** The vehicle monitoring system of claim 1, wherein the ***accelerometer detects a gross lateral acceleration of the vehicle and the control device is configured to calculate the absolute lateral acceleration based upon the gross acceleration value***.
>
> **Claim 8.** The vehicle monitoring system of claim 1 wherein the ***control device activates a performance warning system if the lateral acceleration exceeds the threshold value***.
>
> **Claim 10.** The method of claim 9, wherein ***if the lateral acceleration is greater than the threshold value, then an alert is also issued***.
>
> **Claim 11.** The method of claim 9, wherein ***a control device sends a signal to a speed reduction activation circuit to reduce a speed of the vehicle if the lateral acceleration is greater than the threshold value***.
>
> **Claim 15.** The method of claim 14, wherein ***the braking system is activated based upon a change of heading of the vehicle*** and the direction of lateral acceleration.
>
> **Claim 16.** The method of claim 14, wherein ***the braking system is activated based upon a rate of change of heading of the vehicle*** and the direction of lateral acceleration.

’989 patent at claims 2-6, 8, 10-11, and 15-16 (emphasis added); Nranian Decl., at ¶ 137.

The remaining dependent claims add other features to independent claims 9 and 20 and approximate those dependents presented above (*e.g.*, claims 12 and 21 are roughly the same as

claim 2; claims 13 and 22 are roughly the same as claim 3; claims 14 and 23 are roughly the same as claim 4; claim 17 is roughly the same as claim 6; claims 19 and 27 are roughly the same as claim 8; claim 24 is roughly the same as claim 15; claim 25 is roughly the same as claim 16). Nranian Decl., at ¶ 138.

183. According to a person of skill in the art, these claims are directed to more than any abstract idea. The claims are concrete and specific in the subject matter they claim, which solve the technical problems existing at the relevant priority dates. The foregoing claim elements are both concrete and specific in the physical system they claim, and each of the claims is patentably distinct from each other in what they claim (as emphasized above). Independent claims 1, 9, and 20 are directed to, among other things, systems and methods to solve then-existing problems in vehicle control and safety systems by using accelerometers, speed reduction circuits, control devices, lateral acceleration, and vehicle control devices (such as braking systems, drive wheels, and engines) in a novel and unconventional way to measure lateral acceleration in light of the vehicle's heading that comprises an anti-rollover and stability control system. Claim 1 is directed to a system comprising an accelerometer that detects a vehicle's lateral acceleration; a speed reduction circuit; and a control device to send a signal to a speed reduction activation circuit to reduce a speed of the vehicle based on a heading of the vehicle and if the lateral acceleration is greater than a threshold value (such as by controlling the engine, drive wheel, braking). The dependent claims to this claim are directed more specifically to controlling the speed of the vehicle by slowing engine propulsion (claim 2), slowing the drive wheel (claim 3), engaging the braking system (claim 4), and activating a performance warning system (claim 8). Importantly, each of the elements of claims 1, 2, 3, 4, 8, and 11, among others, are directed to the very specific structures identified above. Each of these additional limitations provides supplemental solutions to then-

existing technical problems in vehicular control and safety systems. A person of skill in the art would understand that each of the highlighted claims above provided a specific improvement in the existing vehicle control and safety systems that did not exist prior to the priority date of the ’989 patent, and, more specifically, provide for specific devices that reduce the speed of a vehicle upon reaching a designated lateral acceleration based on the heading of the vehicle. Nranian Decl., at ¶ 139.

184. These claims also cannot be practiced in the human mind or with pen and paper. There are numerous vehicle crashes involving death and serious injury caused by distracted driving (texting, cell-phone use, and/or intentional or unintentional driver behavior (falling asleep at the wheel, suffering from stroke or heart attack, lacking attention, or lacking compensation for environmental and/or road conditions and surrounding vehicles and objects)), based on human error and/or the human inability to timely perceive and respond. These dangerous and deadly events can be mitigated and/or avoided with proper potential crash and collision warnings, effective crash and collision avoidance, and crash and collision severity mitigation. Furthermore, the occupant injury severity and number of deaths from vehicle crashes of numerous potential crash and collision events can be mitigated through the proper use of automatic collision and crash avoidance and warning systems that automatically warn, and/or automatically sense and actuate various vehicle systems (*e.g.*, braking and warnings) as described and claimed in the ’989 Patent. Humans are not capable of monitoring and accurately measuring all of these vehicular dynamic forces, moments, moments of inertia, and instantaneous vehicle heading in real-time and then respond with proper vehicle braking, steering, and maneuvering for all potential collision and crash events (including front, side, and rollover collisions, along with automotive, truck, car, pedestrian, bicycle, and motorcycle collisions). A human is also not capable of accurately determining a safe

vehicle speed to safely maneuver all turning and lane changing events for all road, weather, and environmental conditions and then properly adjust the vehicle's speed and/or the drive wheel's speed parameters in real-time, based on measured real-time inputs from the sensors (*e.g.*, accelerometers, speed reduction circuits, control devices, lateral acceleration, and vehicle control devices) as described and claimed in the claims of the '989 patent. If humans could do this perfectly in all potential weather, road, and surrounding conditions and circumstances, there would be no deaths and no injuries from vehicle traffic collisions. The '989 patent and its claims cannot be performed mentally by a person and cannot be carried out with a piece of paper and a pencil. For example, a person of skill in the art has never witnessed a person accurately measuring lateral acceleration and all other dynamic vehicle force inputs as well as the instantaneous heading of the vehicle and then controlling and/or adjusting vehicle braking and/or the drive wheel speed parameters in real time while driving around a corner at high rates of speed. A person of skill in the art has witnessed vehicle rollovers and other collisions due to distracted driving and a failure to brake in a timely manner based on the driver's inability to timely perceive and react. The claims of the '989 patent mitigate these deadly and severe problems known in the prior art, and do so through tangible components and systems. A person of skill in the art has witnessed and forensically investigated numerous roll-over and side impact events, as well forward, angled and rear impact events. Many of these events involved death and serious injury. Many of these collisions and crashes were due to driver error, driver distraction, falling asleep at the wheel, and a lack of driver perception and reaction. The roll-over and crash avoidance systems described and claimed in the '989 patent serve to mitigate the number and effects of these events. Also, a person of skill in the art has witnessed and forensically evaluated numerous deadly vehicle roll-over events due to the driver's inability to control vehicles while steering and maneuvering around turns

and corners (which, for example, causes instantaneous changes to the vehicle's dynamics and alters how mass is distributed relative to the active rotation axis during the maneuver; this also alters the vehicle's effective resistance to rotation due to weight transfer, suspension motion, and other factors, that in many real-world situations are beyond human mental, perceptive, and reactive capabilities, thus leading to accidents and crashes because humans cannot accurately compensate to these instantaneous dynamically changing conditions quickly enough to prevent them). Through proper warnings and automatic control of vehicle component (through inputs from sensors, accelerometers, and gyroscopes that control braking, vehicle speed, and or drive wheel parameters that also warn the driver in real-time of a potential loss of vehicle control due to unsafe speed for lateral force conditions, and properly compensate to dynamic changing vehicle, driving, road, road surface, and environmental/weather conditions), the number of injuries, deaths and injury severity of these vehicle accidents will be reduced and mitigated. The '989 patent and its claims mitigate these deadly and severe problems known in the prior art, and does so through tangible vehicle components and systems. These are not abstract concepts. These are not mental concepts readily performed in the human mind. Nranian Decl., at ¶ 140.

185. Additionally, the claims of the '989 patent do not preempt all of the ways of increasing vehicle control and safety by detecting rollover risk. These claims do not preempt any area of innovation in vehicle safety because they require specific hardware components (an accelerometer, speed reduction circuit, and control device) working together using a specific technical approach (a heading-based lateral acceleration evaluation), leaving competitors free to use alternative sensors (*e.g.*, Hamlin Reed sensors), alternative responses (*e.g.*, steering correction), or alternative decision logic. In short, there are many other ways such problems could be managed. Notably, the systems that were disclosed in the more than two hundred and fifteen

(215) prior art patents and publications identified on the face of the patent would also not be preempted. Nranian Decl., at ¶ 141.

186. Even if the ’989 patent claims were directed at an abstract idea (and they are not), the claims capture subject matter that is inventive. According to a person of skill in the art, the claims of the ’989 patent are directed to subject matter that was unknown in the art at the time. To the extent that the claims employ components and technology that existed at the time (*e.g.*, accelerometers, speed reduction circuits, control devices, lateral acceleration, and vehicle control devices), they are used in an unconventional way to provide a specific improvement in then-existing vehicle control and safety systems by creating a system/method that reduces the speed of a vehicle upon reaching a designated lateral acceleration based on the heading of the vehicle. In fact, the ’989 patent’s provision of specific means to reduce the speed of a vehicle at a specific lateral acceleration and to adjust the speed of the vehicle (using, for instance, the braking system, drive wheels, and engine) based on a heading of the vehicle by employing specific, concrete components such as accelerometers, speed reduction circuits, control devices, lateral acceleration, and vehicle control devices was not previously known in the art. Nranian Decl., at ¶ 142.

187. Even if that were not true, the ordered combination of limitations in claims 1, 9, and 20 of the ’989 patent—especially in light of the dependent claims specified above—as recited and described in detail above, were not known in the art, much less well-known. A person of skill in the art was not aware of any art or system that existed at the time and that disclosed all of the limitations of these claims in a way that improved vehicle control and safety systems by detecting and responding to lateral acceleration to prevent rollover and other types of vehicle accidents and improving vehicle stability by slowing down the vehicle when it reaches unsafe lateral acceleration thresholds in light of the vehicle’s heading. A POSITA would have understood that these claims

do not merely employ known generic components in a conventional or routine way. These claims are directed to specific solutions using technology in an inventive and unique way (described above) to solve the problems then-known in the art. Nranian Decl., at ¶ 143.

188. For the reasons stated above, the claims of the ’989 patent claim a combination of elements sufficient to ensure that the claims themselves, both in substance and in practice, are directed to concrete and inventive concepts (and not abstract ideas). Nranian Decl., at ¶ 144.

**INFRINGEMENT OF THE ’989 PATENT**

189. Based upon public information, Plaintiff is informed and believes that Defendant has infringed one or more claims of the ’989 patent, either literally or under the doctrine of equivalents, because it ships, distributes, makes, uses, imports, offers for sale, sells, and/or advertises using its Tesla Traction and Stability Control.

190. Based upon public information, Tesla Traction and Stability Control meets each and every step of at least Claim 9 of the ’989 patent, either literally or equivalently. Specifically, Defendant’s provision of Tesla Traction and Stability Control has infringed, and continues to infringe at least said claims because it provides a method for monitoring a vehicle that comprises detecting lateral acceleration of a vehicle; determining whether that lateral acceleration is greater than a threshold value; and reducing the speed of the vehicle based on the vehicle’s heading. *See* **Exhibit D**.

191. Based upon public information, Defendant’s customers use Tesla Traction and Stability Control in such a way that infringes one or more claims of the ’989 patent. *See* Exhibit D.

192. To the extent that Defendant is not the only direct infringer of one or more claims of the ’989 patent, it instructs its customers on how to use Tesla Traction and Stability Control in

ways that infringe said claims through its support and sales activities.[8]

193. Based upon public information, Defendant specifically intends its customers to use its products and services in such a way that infringes one or more claims of the ’989 patent by, at a minimum, providing and supporting Tesla Traction and Stability Control and instructing its customers on how to use it in an infringing manner, at least through information available on Defendant’s website including information brochures, promotional material, and contact information. *See* Exhibit D.

194. Based upon public information, Defendant has intentionally induced, and continues to induce, infringement of one or more claims of the ’989 patent in this District and elsewhere in the United States, by its intentional acts which have successfully, among other things, encouraged, instructed, enabled, and otherwise caused Defendant’s customers, employees, partners, or contractors to use Tesla Traction and Stability Control in an infringing manner. Defendant took active steps, directly or through contractual relationships with others, with the specific intent to cause them to use Tesla Traction and Stability Control in a manner that infringes one or more claims of the ’989 patent, including, for example, Claim 9. Such steps by Defendant included, among other things, advising or directing customers, personnel, contractors, or end-users to use Tesla Traction and Stability Control in an infringing manner; advertising and promoting the use of Tesla Traction and Stability Control in an infringing manner; or distributing instructions that guide users to use Tesla Traction and Stability Control in an infringing manner. Defendant is performing these steps, which constitute induced infringement with the knowledge of the ’989 patent and with the knowledge that the induced acts constitute infringement. Defendant is aware that the normal and customary use of Tesla Traction and Stability Control by others would infringe

[8] *See* FN 4

one or more claims of the ’989 patent. Defendant’s inducement is ongoing. *See* Exhibit D.

195. Defendant has also indirectly infringed and continues to indirectly infringe by contributing to the infringement of one or more claims of the ’989 patent. Defendant has contributed and continues to contribute to the direct infringement of one or more claims of the ’989 patent by its customers, personnel, and contractors. Tesla Traction and Stability Control has special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the ’989 patent, including, for example, Claim 9. The special features constitute a material part of the invention of one or more of the claims of the ’989 patent and are not staple articles of commerce suitable for substantial non-infringing use. Defendant’s contributory infringement is ongoing. *See* Exhibit D.

196. Despite knowledge of the ’989 patent since as early as the date the original complaint was served, Defendant, based upon public information, continues to encourage, instruct, enable, and otherwise cause its customers to use its products and services, in a manner which infringes one or more claims of the ’989 patent. Based upon public information, the provision of and sale of Tesla Traction and Stability Control is a source of revenue and a business focus for Defendant.

197. Defendant’s aforesaid activities have been without authority and/or license from Plaintiff.

198. Furthermore, on information and belief, Defendant has a policy or practice of not reviewing the patents of others, including instructing its employees to not review the patents of others, and thus have been willfully blind of Vision Works’ patent rights.

199. Defendant’s actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendant.

200. Since at least the filing of the original complaint in this matter, Defendant’s direct

and indirect infringement of the ’989 patent has been and continues to be willful, intentional, deliberate, or in conscious disregard of Plaintiff’s rights under the patent.

201. Vision Works has been damaged and continues to be damaged as a result of the infringing conduct by Defendant alleged above. Thus, Defendant is liable to Vision Works in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

202. Vision Works has suffered and continues to suffer irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law. Vision Works has and will continue to suffer this harm by virtue of Defendant’s infringement of one or more claims of the ’989 patent. Defendant’s actions have interfered with and will interfere with Vision Works’s ability to license technology. The balance of hardships favors Vision Works’s ability to commercialize its own ideas and technology. The public interest in allowing Vision Works to enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

**COUNT V: INFRINGEMENT OF U.S. PATENT NO. 10,410,520**

203. Plaintiff re-alleges and incorporates by reference each of paragraphs 1-74 above as though fully set forth in their entirety.

204. U.S. Patent No. 10,410,520 (the “’520 patent”) was issued on September 10, 2019 after full and fair examination by the USPTO of Application No. 15/792,203 which was filed on October 24, 2017. The ’520 patent is entitled “Absolute Acceleration Sensor For Use Within Moving Vehicles.” *See* ’520 patent at p.1.

205. Vision Works owns all substantial rights, interest, and title in and to the ’520 Patent, including the sole and exclusive right to prosecute this action and enforce it against infringers and to collect damages for all relevant times.

206. Vision Works or its predecessors-in-interest have satisfied all statutory obligations required to collect pre-filing damages for the full period allowed by law for infringement of the ’520 Patent.

207. The written description of the ’520 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

**SUBJECT MATTER ELIGIBILITY**

208. The claims of the ’520 patent are not directed to an abstract idea and are not limited to well-understood, routine, or conventional activity. Rather, the claimed inventions include inventive components that improve vehicle safety by providing a system for communicating information about the speed of a vehicle and about its distance to a nearby vehicle.

209. The relevant ’520 patent claims are directed to physical devices that employ physical devices employ vehicle speed sensors to detect the vehicle’s speed, the range finder, the control device coupled to the vehicle speed sensor and range finder that determines whether the vehicle is a safe distance from objects according to a constant value defined according to the speed of the vehicle and the distance between the vehicle and objects, and in doing so, improves vehicle safety by calculating a speed-dependent safe distance using a constant value that defines how much the safe zone increases per unit of speed, and (depending on the specific claim) further monitors, records, and controls the speed of the vehicle according to the safe distance. Nranian Decl., at ¶ 125.

210. The ’520 patent contains a total of 27 claims (three independent and twenty-four dependent), all directed to the foregoing devices, systems, and methods. For example, claims 1,

12, and 22 of the '520 patent are recited below, and some of the more important elements of the claims are bolded and italicized for emphasis:

> **Claim 1:** A ***system for a moving vehicle*** comprising:
>
> a ***vehicle speed sensor configured for detecting a speed of the vehicle***;
>
> a ***range finder to calculate a distance between the vehicle and an object***; and
>
> ***a control device coupled to the vehicle speed sensor and the rangefinder***, wherein the ***vehicle speed sensor sends a signal to control device based on the speed of the vehicle and the range finder sends a signal to the control device corresponding to the vehicles distance from the object*** and ***based upon the speed of the vehicle and the distance from the object, the control device determines whether the vehicle is a safe distance from the object***, wherein the safe distance is ***determined according to a constant value defined according to the speed of the vehicle and the distance between the vehicle and the object***.
>
> **Claim 12:** A ***method of determining a safe distance of a vehicle from an object*** comprising:
>
> ***determining a speed of the vehicle***;
>
> ***calculating a distance between the vehicle and an object***; and
>
> ***based upon the speed of the vehicle and the distance from the object***, ***determining [] whether the vehicle is a safe distance from the object***, wherein the safe distance is determined ***according to a constant value defined according to the speed of the vehicle and the distance between the vehicle and the object***.
>
> **Claim 22:** A ***system for a moving vehicle*** comprising:
>
> a ***vehicle speed sensor configured for detecting a speed of the vehicle***;
>
> a ***range finder to calculate a distance between the vehicle and an object***;
>
> ***a control device coupled to the vehicle speed sensor and the rangefinder***, wherein ***the vehicle speed sensor sends a signal to control device based on the speed of the vehicle and the range***

> ***finder sends a signal to the control device corresponding to the vehicles distance from the object*** and ***based upon the speed of the vehicle and the distance from the object, the control device determines whether the vehicle is a safe distance from the object***, wherein the safe distance is determined ***according to a constant value defined according to the speed of the vehicle and the distance between the vehicle and the object***; and
>
> a ***speed control system coupled to the control device***, wherein ***the control device operates the speed control system in a manner dependent upon the distance between the vehicle and the object***.

'520 patent at claims 1, 12, and 22 (emphasis added). I have also recited some examples of dependent claims to independent claim 1, which provide:

> **Claim 6.** The communication system of claim 1, wherein ***the range finder is actively pointable***.
>
> **Claim 7.** The communication system of claim 6, wherein ***the range finder is pointable in the direction of the object as the vehicle is making a turn***.
>
> **Claim 8.** The communication system of claim 7, wherein ***the range finder comprises an accelerometer to determine the direction and degree of turn***.
>
> **Claim 9.** The communication system of claim 1, further comprising ***a speed control system coupled to the control device, wherein the control device operates the speed control system in a manner dependent upon the distance between the vehicle and the object***.
>
> **Claim 10.** The communication system of claim 1, comprising ***a warning device that generates an alert if the vehicle is an unsafe distance from the object***.
>
> **Claim 11.** The communication system of claim 1, wherein ***the unsafe distance increases with an increase in speed of the vehicle***.

'520 patent at claims 6-11 (emphasis added). The remaining dependent claims add other features and/or are roughly identical to those presented above (*e.g.*, claims 13 and 25 are roughly the same as claim 6; claims 18 and 26 are roughly the same as claim 7; claims 19 and 27 are roughly the same as claim 8; claim 20 is roughly the same as claim 10; and claim 21 is roughly the same as claim 11); Nranian Decl., at ¶ 126.

211. According to a person of skill in the art, these claims are directed to more than any abstract idea. The claims are concrete and specific in the subject matter they claim, which solve the technical problems existing at the relevant priority dates. For instance, claim 1 is directed to a system comprising a vehicle speed sensor to detect a vehicle's speed, a range finder to calculate a distance between the vehicle and an object; a recorder for recording an operation status of the vehicle; and a control device coupled to the range finder and vehicle speed sensor, where the vehicle speed sensor sends a signal to the control device based on the vehicle's speed and the range finder sends a signal to the control device based on the vehicle's distance from an object; the control device uses these signals to determine whether the vehicle is a safe distance from that object. The dependent claims to this claim are directed to more specific devices, including those that include an accelerometer (claim 8), a speed control system coupled to the control device (claim 9), and a warning device (claim 10). Importantly, each of the elements of claims 1, 8, 9, and 10, among others, are directed to the very specific structures identified above, and the other independent claims (and their dependents) likewise claim specific structures. Each of these additional limitations provides supplemental solutions to then-existing technical problems in vehicular control and safety systems. A POSITA would understand that each of the highlighted claims above provided a specific improvement in then existing vehicular control and safety systems that did not exist in the manner described in the '520 patent prior to the priority date of the '520 patent, and, more specifically, as described in the '520 patent, provide for specific systems/methods as specifically described in the '520 patent that improve vehicle safety by calculating a speed-dependent following distance using a constant value defining how much the safe zone increases per unit of speed, and (depending on the specific claim) further monitors, records, and controls the speed of the vehicle according to the safe distance. Nranian Decl., at ¶

127.

212. Additionally, none of these claims are directed to subject matter that can be performed by a human, mentally or with pen and paper. The claims require physical range finder hardware to measure distances to moving vehicles in real-time, which cannot be done mentally or by human observation. The system must continuously and simultaneously measure speed, calculate speed-dependent safety thresholds, compare actual distances, and trigger recordings—all happening multiple times per second—which is computationally impossible for humans to perform while driving. The automated integration of sensors, real-time calculations, and automatic recording without human intervention represents a technological solution that fundamentally cannot be replicated through mental steps or pen-and-paper calculations. Nranian Decl., at ¶ 128.

213. Additionally, the claims of the '520 patent do not preempt all the ways of determining a safe distance between a vehicle and an object. For instance, systems where the safe distance is not determined according to a constant value defined according to the speed of the vehicle and the distance between the vehicle and the object would not be preempted. Notably, the systems that were disclosed in the more than two hundred (200) prior art patents and publications identified on the face of the patent would also not be preempted. Nranian Decl., at ¶ 129.

214. Even if the '520 patent claims were directed at an abstract idea (and they are not), the claims capture subject matter that is inventive when considering what is specifically described in the '520 patent. According to a person of skill in the art, the claims of the '520 patent are directed to subject matter that was unknown in the art at the time. To the extent that the claims employ components and technology that existed at the time (*e.g.*, rangefinders, speed sensors, and control devices), they are employed together here in a way that was new and would not have been considered conventional, routine, or generic to those skilled in the art when considering what is

specifically described in the ’520 patent; the claims of the ’520 patent improve vehicle safety by creating systems/methods of calculating a speed-dependent safe distance using a constant value that defines how much the safe zone increases per unit of speed, and monitors, records, and controls the speed of the vehicle according to the safe distance using these technology elements as specifically described in the ’520 patent, and which represented an unconventional use of technology. Nranian Decl., at ¶ 130.

215. Even if that were not true, the ordered combination of limitations in claims 1, 12, and 22 of the ’520 patent in consideration with what is specifically described in the ’520 patent, as recited and described in detail above, were not known in the art. A person of skill in the art would have understood that these claims, when considered as specifically described in the ’520 patent do not merely employ known generic components in a conventional or routine way. These claims, taken in consideration of the specific description of the ’520 patent, are directed to specific solutions using technology in an inventive and unique way (as described above) to solve the problems then-known in the art. Nranian Decl., at ¶ 131.

216. For the reasons stated above, the claims of the ’520 patent claim a combination of elements sufficient to ensure that the claims themselves, both in substance and in practice, are directed to concrete and inventive concepts (and not abstract ideas). Nranian Decl., at ¶ 132.

217. Also, most importantly, there are numerous vehicle crashes involving death and serious injury that are caused by distracted driving (such as texting, cell-phone use, and/or intentional or unintentional driver behavior (such as falling asleep at the wheel, suffering from strokes or heart attacks, failing to pay attention, and lacking compensation for environmental and/or road conditions and surrounding vehicles and objects) caused by human error and/or the inability of timely human perception and response. These dangerous and deadly events can be

mitigated and/or avoided with proper potential crash and collision warnings and effective crash and collision avoidance, as well as crash and collision severity mitigation. Furthermore, the occupant injury severity and number of deaths from vehicle crashes of numerous potential crash and collision events can be mitigated through the proper use of automatic collision and crash avoidance and warning systems that automatically warn and/or automatically sense and actuate various vehicle systems (*e.g.*, braking and warning) as described and claimed in the '520 Patent. Humans are not capable of monitoring and accurately measuring all of these driving conditions and factors for all situations and circumstances in real-time and then responding with proper vehicle braking, steering, and maneuvering for all potential collision and crash events (including those involving front, side, and rollover collisions, and those involving automotive, truck, car, pedestrian, bicycle, and motorcycle collisions). A human is also not capable of keeping track of all surrounding vehicle conditions, objects, and surrounding driver/vehicle behaviors in real-time in all conditions and circumstances. As described and claimed in the '520 Patent, this is performed in real-time based on measured real-time inputs from the sensors (*e.g.*, pointable range finders, distance measurement and tracking as well as inputs from accelerometers, speed sensors, and gyroscopes) as described and claimed in the '520 Patent. If humans could do this perfectly in all potential weather, road, and surrounding conditions and circumstances, there would be no deaths and no injuries from vehicle traffic collisions. Nranian Decl., at ¶ 133.

218. The '520 Patent and its claims cannot be performed mentally by a person and cannot be carried out with a piece of paper and a pencil. A person of skill in the art has witnessed rear-end collisions due to distracted driving and a failure to brake in a timely manner due to the driver's inability to timely perceive and react. What is described and claimed in the '520 patent mitigates these deadly and severe problems known in the prior art, and does so through tangible components

and systems. For example, in a case where a six-year-old boy was rendered a quadriplegic because the driver of the at-fault vehicle failed to recognize the right of way of the on-coming vehicle and improperly made a left turn into oncoming traffic, this and numerous other such collisions and crashes were due to driver error, driver distraction, falling asleep at the wheel, sunlight and glare blinding, and lacking driver perception and reaction. The collision warning, rear end collision, and crash avoidance systems, as described and claimed in the ’520 Patent, serve to mitigate the number and effects of these events. Also, a person of skill in the art has witnessed and forensically evaluated numerous deadly vehicle accidents due to a driver’s inability to recognize other vehicles and objects driving and maneuvering and/or suddenly stopping, resulting in rear-end and other types of deadly and serious accidents. Through proper warnings and automatic control of vehicle systems to stop or lessen the severity of these events, the ’520 Patent mitigate these deadly and severe problems known in the prior art and do so through tangible vehicle components and systems. Warning and vehicle component control (through inputs from range finders, pointable range finders, sensors, accelerometers, and gyroscopes that control braking and warn about vehicles and objects ahead) mitigate the number and severity of rear-end collisions, which make up 30 to 40 percent of accidents and are typically caused by the driver’s inability to perceive and react in time or driver distraction. Through what is described and claimed in the ’520 Patent, the number of injuries, deaths and injury severity of these events will be mitigated. The systems and methods described and claimed in the ’520 Patent are not abstract concepts. These are not mental concepts readily performed in the human mind, but rather provide concrete and tangible solutions to deadly and serious vehicular collision events and also mitigate death and serious injury. Nranian Decl., at ¶ 134.

219. Many collisions and crashes are caused by driver error, driver distraction, falling

asleep at the wheel, and the driver's lack of perception and reaction. The collision warning and crash avoidance systems, as described and claimed in the '520 Patent, serve to mitigate the number and effects of these events. Also, a person of skill in the art has witnessed and forensically evaluated numerous deadly vehicle events due to real-world situations beyond human mental, perceptive, and reactive capabilities; these lead to accidents and crashes because humans cannot accurately compensate to these instantaneous and dynamically-changing driving vehicle, surrounding vehicle, object, and surrounding vehicle driver behavior situations and circumstances and dynamically change their conditions quickly enough to prevent these accidents and crashes. A person of skill in the art has witnessed and forensically evaluated numerous deadly rear-end collisions due to the driver's inability to perceive and react to stalled-out vehicles and stationary objects on the road ahead. Through proper warnings and automatic control of vehicle components (such as inputs from sensors, accelerometers, gyroscopes that control braking and warning, and vehicle components that properly compensate to these dynamic circumstances and conditions), the number of injuries, deaths and injury severity will be mitigated. The '520 Patent mitigates these deadly and severe problems known in the prior art, and do so through tangible vehicle components and systems. These are not abstract concepts. These are not mental concepts readily performed in the human mind. Nranian Decl., at ¶ 135.

**INFRINGEMENT OF THE '520 PATENT**

220. Based upon public information, Plaintiff is informed and believes that Defendant has infringed one or more claims of the '520 patent, either literally or under the doctrine of equivalents, because it ships, distributes, makes, uses, imports, offers for sale, sells, and/or advertises using its Tesla Autopilot.

221. Upon information and belief based upon public information, Tesla Autopilot meets each and every step of at least Claim 12 of the '520 patent, either literally or equivalently.

Specifically, Defendant's provision of Tesla Autopilot has infringed, and continues to infringe, at least said claim because it provides a method for determining a safe distance of a vehicle from an object by determining the vehicle's speed, calculating the distance between the vehicle and the object; and determining whether the vehicle is a safe distance from the object based upon a constant value defined according to the speed of the vehicle and the distance between the vehicle and the object. *See* **Exhibit E**.

222. Based upon public information, Defendant's customers use Tesla Autopilot in such a way that infringes one or more claims of the '520 patent. *See* Exhibit E.

223. To the extent that Defendant is not the only direct infringer of one or more claims of the '520 patent, it instructs its customers on how to use Tesla Autopilot in ways that infringe said claims through its support and sales activities.[9]

224. Based upon public information, Defendant specifically intends its customers to use its products and services in such a way that infringes one or more claims of the '520 patent by, at a minimum, providing and supporting Tesla Autopilot and instructing its customers on how to use it in an infringing manner, at least through information available on Defendant's website including information brochures, promotional material, and contact information. *See* Exhibit E.

225. Based upon public information, Defendant has intentionally induced, and continues to induce, infringement of one or more claims of the '520 patent in this District and elsewhere in the United States, by its intentional acts which have successfully, among other things, encouraged, instructed, enabled, and otherwise caused Defendant's customers, employees, partners, or contractors to use Tesla Autopilot in an infringing manner. Defendant took active steps, directly or through contractual relationships with others, with the specific intent to cause them to use Tesla

---

[9] *See* FN 4.

Autopilot in a manner that infringes one or more claims of the '520 patent, including, for example, Claim 12. Such steps by Defendant included, among other things, advising or directing customers, personnel, contractors, or end-users to use Tesla Autopilot in an infringing manner; advertising and promoting the use of Tesla Autopilot in an infringing manner; or distributing instructions that guide users to use Tesla Autopilot in an infringing manner. Defendant is performing these steps, which constitute induced infringement with the knowledge of the '520 patent and with the knowledge that the induced acts constitute infringement. Defendant is aware that the normal and customary use of Tesla Autopilot by others would infringe one or more claims of the '520 patent. Defendant's inducement is ongoing. *See* Exhibit E.

226. Defendant has also indirectly infringed and continues to indirectly infringe by contributing to the infringement of the '520 patent. Defendant has contributed and continues to contribute to the direct infringement of the '520 patent by its customers, personnel, and contractors. Tesla Autopilot has special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe one or more claims of the '520 patent, including, for example, Claim 12. The special features constitute a material part of the invention of one or more of the claims of the '520 patent and are not staple articles of commerce suitable for substantial non-infringing use. Defendant's contributory infringement is ongoing. *See* Exhibit E.

227. Despite knowledge of the '520 patent since as early as the date the original complaint was served, Defendant, based upon public information, continues to encourage, instruct, enable, and otherwise cause its customers to use its products and services, in a manner which infringes one or more claims of the '520 patent. Based upon public information, the provision of and sale of Tesla Autopilot is a source of revenue and a business focus for Defendant.

228. Defendant's aforesaid activities have been without authority and/or license from

Plaintiff.

229. Furthermore, on information and belief, Defendant has a policy or practice of not reviewing the patents of others, including instructing its employees to not review the patents of others, and thus have been willfully blind of Vision Works' patent rights.

230. Defendant's actions are at least objectively reckless as to the risk of infringing a valid patent and this objective risk was either known or should have been known by Defendant.

231. Since at least the filing of the original complaint in this matter, Defendant's direct and indirect infringement of the '520 patent has been and continues to be willful, intentional, deliberate, or in conscious disregard of Plaintiff's rights under the patent.

232. Vision Works has been damaged and continues to be damaged as a result of the infringing conduct by Defendant alleged above. Thus, Defendant is liable to Vision Works in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

233. Vision Works has suffered and continues to suffer irreparable harm, through its loss of market share and goodwill, for which there is no adequate remedy at law. Vision Works has and will continue to suffer this harm by virtue of Defendant's infringement of one or more claims of the '520 patent. Defendant's actions have interfered with and will interfere with Vision Works's ability to license technology. The balance of hardships favors Vision Works's ability to commercialize its own ideas and technology. The public interest in allowing Vision Works to enforce its right to exclude outweighs other public interests, which supports injunctive relief in this case.

## JURY DEMAND

234. Plaintiff demands a trial by jury on all issues so triable by right.

## PRAYER FOR RELIEF

235. Plaintiff respectfully requests the following relief:

A. An adjudication that one or more claims of the Asserted Patents has been infringed, either literally and/or under the doctrine of equivalents, by Defendant;

B. An award of damages to be paid by Defendant adequate to compensate Plaintiff for Defendant's past infringement, including interest, costs, and disbursements as justified under 35 U.S.C. § 284 and, if necessary to adequately compensate Plaintiff for Defendant's infringement, an accounting of all infringing sales including, but not limited to, those sales not presented at trial;

C. A permanent injunction enjoining Defendant and its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in concert therewith from infringement of the Asserted Patents; or, in the alternative, an award of a reasonable ongoing royalty for future infringement of said patents by such entities;

D. Judgment that Defendant's infringements be found willful as to the Asserted Patents; and that the Court award treble damages for the period of such willful infringement pursuant to 35 U.S.C. § 284;

E. Pre-judgment and post-judgment interest on the damages caused by Defendant's infringing activities and other conduct complained of herein;

F. That this Court declare this to be an exceptional case and award Plaintiff its reasonable attorneys' fees and costs in accordance with 35 U.S.C. § 285; and,

G. Any further relief that this Court deems just and proper.

Dated: December 24, 2025

Respectfully submitted,

*/s/ James F. McDonough, III*

James F. McDonough, III (GA 117088) *
Jonathan R. Miller (GA 507179) *
**ROZIER HARDT MCDONOUGH PLLC**
659 Auburn Avenue NE, Unit 254
Atlanta, Georgia 30312
Telephone: (404) 564-1866, -1863
Email: jim@rhmtrial.com
Email: miller@rhmtrial.com

Jonathan L. Hardt (TX 24039906) *
**ROZIER HARDT MCDONOUGH PLLC**
712 W. 14th Street, Suite A
Austin, Texas 78701
Telephone: (210) 289-7541
Email: hardt@rhmtrial.com

C. Matthew Rozier (CO 46854) *
**ROZIER HARDT MCDONOUGH PLLC**
1001 Bannock Street, Suite 241
Denver, Colorado 80204
Telephone: (404) 779-5305; (202) 316-1591
Email: matt@rhmtrial.com

**Attorneys for *Plaintiff* *VISION WORKS IP CORP.***

* Admitted to the Eastern District of Texas

**Exhibits**

1. Declaration of Mr. Michael Nranian
2. Mr. Michael Nranian's Educational and Professional Background
3. Materials Considered

A. Evidence Of Use – U.S. Patent No. 8,315,769
B. Evidence Of Use – U.S. Patent No. 8,682,558
C. Evidence Of Use – U.S. Patent No. 9,830,821
D. Evidence Of Use – U.S. Patent No. 10,391,989
E. Evidence Of Use – U.S. Patent No. 10,410,520

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this day a true and correct copy of the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this document was served on all counsel who are deemed to have consented to electronic service.

Dated: December 24, 2025

Respectfully submitted,

*/s/ James F. McDonough, III*
James F. McDonough, III